## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

IN RE:                                              Case No. 10-09108
                                                    Chapter 11
    Gyro Trac (USA), Inc.,

           Debtor.


## DISCLOSURE STATEMENT

Filed by the Debtor-in-Possession on April 2, 2010


### Table of Contents

| | Page |
|---|---|
| I. Introduction | 2 |
| II. History and Events Leading to Bankruptcy | 3 |
| III. Post-Petition Activity | 12 |
| IV. Property of the Debtor | 13 |
| V. Summary of Proposed Plan | 14 |
| VI. Liquidation Analysis | 16 |
| VII. Feasibility of Plan | 19 |
| VIII. Tax Consequences | 20 |
| IX. Conclusion | 20 |

## DISCLOSURE STATEMENT

## I.    INTRODUCTION

Gyro Trac (USA), Inc. (the "Debtor") provides this Disclosure Statement to all of its known creditors in order to disclose information considered by the Debtor to be important, material and necessary for the creditors to make a reasonably informed decision in exercising their right to vote on the Plan of Reorganization of the Debtor (the "Plan") which has been summarized herein and will be filed with this Disclosure Statement in the United States Bankruptcy Court for the District of South Carolina. This Disclosure Statement must provide such information, as far as practicable, that would enable a hypothetical investor typical of the holders of claims against the Debtor, to make an informed judgment about the Plan. The Debtor feels that the information provided in this Disclosure Statement gives information which is adequate for an investor to make such a decision. The United States Bankruptcy Court will set a hearing to determine if this Disclosure Statement provides adequate information and conforms to the requirements of the Bankruptcy Code (11 U.S.C. §101 et seq.).

The United States Bankruptcy Court will set a date at a later time for a hearing on the acceptance of the Plan or may combine the Disclosure Statement and Plan hearing. Notice of the hearing will be mailed to all holders of claims, and upon receiving the Notice of Hearing, holders of claims may vote on the Plan by completing the ballot mailed with the Plan and Notice of Hearing and then returning the ballot to the Bankruptcy Court. The Notice of Hearing will specify a time within which the ballots must be returned. The vote of all creditors and holders of claims is very important. The Plan will be confirmed by the Court if it is accepted by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the creditors or holders of claims in each class voting on the Plan, and two-thirds (2/3) in number of the holders of allowed interests voting on the Plan. In the event the requisite number of acceptances are not obtained, the Court may still confirm the Plan if the Court finds the Plan accords fair and equitable treatment to those classes rejecting the Plan.

The Debtor reserves the right to object to any claim prior to the closing of the case. The Debtor also reserves its right to bring any potential avoidance actions pursuant to 11 U.S.C. §§ 547, 548, 549, and 550.

The Plan represents a legally binding arrangement and should be read in its entirety, rather than relying on the summary in this Disclosure Statement. Approval of the Disclosure Statement by the United States Bankruptcy Court does not constitute approval by the Bankruptcy Court on the merits of the Plan.

EXCEPT WHERE SPECIFICALLY STATED OTHERWISE, THE DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR AND HAS BEEN PREPARED BASED ON INFORMATION AVAILABLE TO THE DEBTOR. NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY THE VALUE OF THE ASSETS OF THE DEBTOR) ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY.

## II.    HISTORY OF THE DEBTOR AND EVENTS LEADING TO THE FILING OF BANKRUPTCY

The Debtor is a South Carolina corporation engaged in the business of sales and service of forestry equipment, particularly brush cutters and their parts and accessories.  Debtor and its affiliates developed and designed Gyro-Trac products over the past 15 years.  The brush cutter is a single-purpose, rubber-tracked conveyance with cutter-head attached in the front.  Through the spinning motion of the drum and the unique arrangement of the cutting teeth, the brush cutter is able to take down trees and brush and quickly turn it into mulch without destroying the surrounding environment.  What would have previously taken several workers and varying types of equipment could now be completed more quickly with one Brushcutter and one operator.  Gyro-Trac brush cutters were among the first on the market to use a technology that mulches trees and other debris in to wood chips, thereby reducing the need for costly hauling and waste disposal in land clearing. Gyro-Trac products are specialty products which require specialized skill and training for optimum operation and efficient maintenance for which Debtor and its affiliates are the only resources. The market still has few different brands and is essentially a boutique market unique from other heavy equipment industries.

The concept for Gyro-Trac equipment originated with Daniel Gaudreault and his brother, who were in the land clearing and forestry business in northern Québec.  The brothers developed

a specialized brushcutter for land clearing for their own use, but upon being observed by other land clearing business owners, demand for additional machines grew, and the brothers began building brushcutters for resale.  Over the past two decades, the products have improved and developed into a product line that currently markets the GT-13XP, GT-25XP, GT-40, GT-60, and individual cutter-heads for use on a basic skid steer.

In the late 1990s, Daniel Gaudreault moved his young family to South Carolina to begin establishing a business for Gyro-Trac in the United States, while his brother remained in Québec to oversee those operations and production.  In or around 2005, Daniel bought out his brother's interest in Gyro-Trac, and the various Gyro-Trac interests were organized into three corporations.  The holding company, Gyro-Trac, Inc., presently owns 100% of the Debtor's stock, and it is the debtor in possession in a related case filed under title 11, South Carolina Bankruptcy Court Case 10-1909dd. Gyro-Trac, Inc. also holds 100% of the stock of Gyro-Trac West Coast, Inc., a Canadian affiliate of the Debtor who performed similar operations as Debtor, but in western Canada.  Daniel Gaudreault owns 70% of the stock of Gyro-Trac, Inc. while Desjardins capital de risque/Innovatech owns 25 %. Steve Quirion owns the remaining 5%.  Gyro-Trac West Coast, Inc. ceased operations on November 30, 2009, and is also a debtor-in-possession in a related case filed under title 11, South Carolina Bankruptcy Court Case 10-1910dd.

The current unique cutter-head technology used by Gyro-Trac is subject to a patent held by Denis CIMAF and is used by Gyro-Trac under license from Denis CIMAF.  In December 2008, Gyro-Trac, Inc. and Denis CIMAF reached a universal settlement agreement of various lawsuits between them involving some of their previous agreements.  As part of this settlement, Denis CIMAF granted Gyro-Trac a license for Gyro-Trac's exclusive use of the technology in North America for all equipment except excavators. The use of this license, however, is contingent upon several conditions.  Gyro-Trac must pay an annual license fee that increases exponentially over the term of the agreement.  Under the December 2008 agreement, the license fees were to be received annually by Denis CIMAF's attorney no later than December 1st of each year during the term of the agreement. The annual license fee due to Denis CIMAF in December 2009 was in the amount of $250,000.00 (CDN).   Another condition of the license is that it may only be owned by a company in which Daniel Gaudreault has a controlling ownership interest, which makes the license personal to Daniel Gaudreault.

Beginning in 2005, the equipment, accessories and parts sold by the Debtor and Gyro- Trac West Coast were manufactured or obtained solely for Debtor by a Québec company known as Usitech NOV, Inc. ("Usitech"). Usitech was a Canadian corporation of which the majority of the stock was owned by a family trust for the Labbé family (who had owned Usitech prior to its incorporation) with the minority ownership interests being held by Daniel Gaudreault and two other individuals. Usitech was the sole source of equipment and parts for Debtor from 2005 until December 2009, when Usitech was forced into receivership in Québec. PricewaterhouseCoopers, Inc. was appointed as a receiver for a portion of the Usitech debt. The Debtor owes an unsecured debt of approximately $3.2 million to Usitech.

When Daniel Gaudreault moved to South Carolina, Debtor began pursuing the United States market through the use of direct sales, adding salesmen and service technicians to travel throughout the United States based upon demand. As the sales of the machines grew, however, Debtor began to enter dealership agreements with heavy equipment dealers throughout the United States. One of these dealerships ended in a legal dispute that is one of the chief precipitating factors of the Debtor's insolvency. In 2007, Right Of Way Maintenance Equipment Company ("ROWMEC") of Texas obtained a judgment of approximately $3.6 million against the Debtor and Gyro-Trac, Inc. based upon an alleged breach of the dealership agreement. Gyro-Trac, Inc. and Debtor posted a bond to stay collection pending appeal based upon a letter of credit issued by the Bank of Montreal ("BMO"). The judgment was affirmed on appeal, and in early 2009, BMO paid ROWMEC $3.6 million upon its demand pursuant to the letter of credit. Apparently, the payment under the letter of credit did not satisfy the judgment interest owed to ROWMEC. In Summer 2009, ROWMEC filed for Chapter 11 protection in the United States Bankruptcy Court for Southern District of Texas in Houston, and has subsequently filed two adversary proceedings against Debtor and Gyro-Trac, Inc. for recovery of this interest on the 2007 judgment. On March 11, 2010, the Texas Bankruptcy Court entered summary judgment in favor of ROWMEC against Debtor and Gyro-Trac, Inc. in the amount of $320,599.91 for the unpaid judgment interest.

Even though the relationship with ROWMEC did not work out, demand for Debtor's product at that time dictated that Debtor continue to pursue dealership relationships with other entities throughout the United States so that Debtor could meet obligations of the market and its customers. Debtor ultimately granted several individual Vermeer dealers exclusive dealer appointments for the

Southeast, Texas, the Midwest, Southern Ohio, Minnesota and portions of the United States' west coast. Debtor also entered into a dealer agreement with the Vermeer dealer in Australia while sales and service in western Canada shifted from Gyro-Trac West Coast to Vermeer Canada.  In late 2007, Vermeer Manufacturing ("Vermeer") approached Debtor about a possible joint venture going forward, and in or around August 2008, Debtor entered into a distribution agreement with Vermeer.  The sum of these relationships would become another precipitating factor for Debtor's financial problems.

The distribution agreement and discussions with Vermeer were supposed to result in Debtor being able to offer its products in approximately 300 domestic Vermeer retail outlets plus additional international venues.  Additionally, Vermeer and Debtor began working together to develop a co-branded product for distribution through Vermeer's dealer network. As part of this process, Debtor spent in excess of $1 million in testing and modifying the GT-25XP for use as a future co-branded product.  This was a huge commitment from Debtor because the GT-25XP had been its "flagship." In reliance on representations by Vermeer, Debtor entered into this risk.

As a result of the dealer agreements and the distribution agreement, Debtor's ability to make direct sales was severely limited and Debtor had to rely on the dealers for sales of both equipment and parts.  Debtor's sales team stopped making direct sales and began providing dealer support in getting the dealers up to speed and assisting the dealers salespersons in making sales to customers. Debtor's service and parts department went from working directly for Gyro-Trac equipment owners to providing training and support for the dealers who then assisted the customers.  Debtor began to see its profit margin drop somewhat because of the difference between selling retail and selling wholesale, but the Debtor expected to recover swiftly based on increased exposure and territory from the dealers.

Meanwhile, Debtor worked diligently to complete the project of getting the co-branded GT-25XP ready for production, and completed 99.9% of this project by January 2009. While Debtor was meeting its obligations to Vermeer, Vermeer apparently began to waiver on previous representations as to how the future relationship between Debtor and Vermeer would proceed. Debtor did not become aware of Vermeer's change in position until after the work on the GT-25XP had been completed.  In Spring 2009 Debtor and Vermeer spent much time in negotiations and discussions about the future of their relationship. During that time and perhaps as early as Fall 2008, the dealers'

sales activity slowed, in part because of the ambiguity of where the Debtor-Vermeer relationship was headed. This was not known by Debtor, however, until much later. While a slowing economy may have been partly to blame, the dealers' sales appeared to be off by much more than could be attributed solely to the declining economy.

Discussions between Debtor and Vermeer continued, and in late spring 2009, it appeared to Debtor that the issues had been mostly resolved and the relationship would go forward, when suddenly, at the end of May 2009, Vermeer sent Debtor a notice of termination of the distribution agreement. Thereafter, there were new indications that Vermeer would still be willing to talk about a long-term relationship with Debtor, but ultimately, no resolution was made. After spending millions of dollars in preparation for the new arrangement and virtually eliminating its own direct sales and service operations, Vermeer had reneged on the deal, leaving Gyro Trac without an active sales force and bound by restrictive dealer agreements.

The continued existence of these dealer agreements has been another factor in the Debtor's precarious financial position by limiting Debtor's ability to make direct sales while dealers were also generally not pursuing sales of Gyro-Trac product. When dealers sold inventory, they did not order replacements for Debtor. The agreements prohibited Debtor from pursuing direct sales in some of what had historically been Debtor's most profitable territories. The Debtor has moved to reject these contracts, and the reorganized Debtor plans to make sales and service directly or through contractors reclaiming its previous markets from the dealers. This is expected to provide a significant increase in profit from the sale of equipment.

During Fiscal Year 2009, the Debtor made most of its equipment sales to dealers, including selling four machines to its affiliate Gyro-Trac West Coast for resale to a customer in Benin, Africa. International banking and overseas shipping requirements made the transaction with Benin complicated, involving an international letter of credit. To facilitate this transaction, terms of the floor plan agreement required Debtor to pay off the BB&T liens on the equipment when it was sold to West Coast, even though West Coast did not repay Debtor until West Coast received payment from the Benin Customer. When the Benin customer sought to purchase four more machines a couple of months later, BMO refused its consent to the logistics which would permit completion of the sale. Further, shortly after the proceeds from the first sale were received by West Coast, BMO seized the new proceeds in an amount in excess of $425,000 (CDN).

To address this problem, in August 2009, Daniel Gaudreault formed a new corporation, Gyro-Trac International, Inc., of which he was the sole shareholder, for the purpose of facilitating future sales like that to Benin.  The general idea was that Gyro-Trac International would buy the equipment from Debtor or Gyro-Trac West Coast and then re-sell it to Benin (or other international customer).  Customer would then pay Gyro-Trac International. In this scenario, Gyro-Trac International rather than the banks would bear the risk of loss should the international customer refuse to make payment after the equipment had been shipped.

At the same time that Debtor was involved with negotiations with Vermeer, in or around early 2009, Debtor entered into discussions with BMO for the restructuring of the overall debt of Debtor and the other Gyro-Trac entities as well as Usitech.  Negotiations continued and ultimately the parties reached a consensus and closing of the financial restructuring was scheduled for late October 2009.  As part of this process, various parties had to give their agreement and Desjardins and Daniel Gaudreault had to agree to contribute additional cash.  All parties had agreed and were prepared to move forward with closing when suddenly, Desjardins made additional, unreasonable demands on which consensus could not be reached.  Desjardins' actions caused the financial restructuring that Debtor, BMO and others had worked on for many months to collapse.   Usitech was forced into receivership. BMO seized certain assets of Gyro-Trac West Coast, in addition to cash in the amount of approximately $450,000, which they had attached earlier in the year.  Further, BMO has also seized certain assets of the Debtor which were located in Québec.

Usitech had been Debtor's sole supplier for more than 4 years, and the receivership in December 2009 left Debtor with no source for parts going into the busy west Canadian season.  Usitech completely shut down in mid-December 2009, and the new entity, Usitech Nov Industries, opened in mid-January 2010.  In mid-December 2009, Debtor was forced to find new sources for parts, many of which are unique to Debtor's product and not produced by anyone but Usitech.  Debtor turned to Gyro-Trac International to replace Usitech as the supplier.  Gyro-Trac International sought to establish new sources but because of the Usitech situation and the cultural effect of that situation in Canada, most all parts or portions of parts had be bought pre-paid.  As a result, Debtor was also required to pre-pay its parts much of the time.   Meanwhile, one of the dealers fell significantly into arrears on its parts account with Debtor.  When the parts came in, the dealer was not able financially to purchase them and contractual restrictions prohibited Debtor from selling

directly to the dealer's customers. These situations coupled together to severely limit Debtor's cash flow over the last four months. As of the date of filing, Debtor had converted all parts accounts to pre-payment or COD rather than the net-30 terms previously offered.

Gyro-Trac International provided a solution to another imminent problem fast approaching Debtor at the end of 2009. When the financial restructuring plan with BMO fell through at the end of October 2009, the annual license fee to Denis CIMAF was due less than five weeks later. Essentially, Debtor had just been betrayed by its own holding company when Desjardins caused the financial restructuring to collapse by backing out. The license, however, is essential for the production and continuation of the current and future Gyro-Trac products. A private source agreed to help in making the license fee payment but only if Desjardins was not involved. The money for the license payment was loaned to Gyro-Trac International, who received assignment of the license agreement on October 28, 2009. Gyro-Trac International was able to negotiate with Denis CIMAF for an extension on the payment due date, at the cost of approximately $25,000 in addition to the original fee due. Gyro-Trac International paid the 2010 license fee, thereby ensuring Debtor its continued use.

Additional precipitating factors were two lawsuits arising out of two independent sales of equipment. In February 2009, the District Court for South Carolina entered judgment in favor of Thunder Bay Tree Service, LLC in the amount of $660,000 following a jury verdict in June 2008. Debtor reached a settlement in the second suit in March 2009, but that settlement required Debtor to pay a significant amount of cash up front as well as make significant monthly payments for a period of two years. Debtor has paid approximately $480,000 towards settlement since March 2009. Although Debtor appealed the Thunder Bay decision, which was still pending at the time of Debtor's filing, in early March 2010, Thunder Bay seized eight new GT-25XPs pursuant to a writ of execution on its 2009 judgment. That equipment is all subject to lien by BB&T and/or BMO. The Debtor has demanded the return of the machines, and anticipates they will be returned to the Debtor's inventory.

In the best of economies, these tribulations would be trying, but Debtor's market has suffered severely in the recent economic climate and has been beset by the general economic downturn resulting in a depressed market for new equipment as well as parts.

During the past year, Debtor's revenues from both the sale of equipment and the sale of parts

were significantly lower than Debtor enjoyed over previous years.  Gross revenue in 2007 was approximately $24 million and in 2008 approximately $15 million, but in 2009 gross revenues were only approximately $6.7 million. Current, short term assets decreased between 2008 and 2009 by approximately $3.1 million, but current, short term liabilities in 2009 increased by approximately $10.2 million over that in 2008. Bad debts increased between 2008 to 2009 by approximately $850,000.

Even with the dealership issues and the economic slump that has hit the land-clearing forestry business particularly hard, the Debtor made significant sales in the past year.  The Debtor generated gross income from sales of new machines and parts of $5.6 million.  This led to the scheduled repayment of the debts of BB&T and payment to BMO of approximately $450,000 and the payment on lawsuit settlements of approximately $480,000.

Debtor's largest secured debts are owed to BB&T and BMO.  The debt to BB&T arises from floor plan financing of new equipment.  The debt to BMO arises out of debt owed by Gyro-Trac West Coast to BMO for which Debtor is a guarantor, with much of that debt originating in the letter of credit paid to ROWMEC in early 2009.  Decreased revenues in 2009 appear to be a result of economic downturn and the situation with Vermeer and the dealers.  The Vermeer/dealer situation can be resolved by rejection of the dealer agreements and pursuit of direct sales.  Cash flow should increase by virtue in the change of credit terms for Debtor's customers to match those being required of Debtor by its suppliers.

## GYRO TRAC INTERNATIONAL

Under the proposed plan of reorganization, the assets of Gyro Trac International will be merged with the Debtor to form the surviving entity. Gyro Trac International has assets as follows:

1.    Gyro Trac International has received approval for financing to purchase the Usitech NOV assembly line facilities in Quebec.  Caisse Popular, the secured lender to Usitech, has approved the sale and financing for $450,000 (CND), and closing is anticipated within 30-45 days.

2.    Gyro Trac International has purchased parts for the factory in the amount of $15,000. Gyro Trac International has obtained financing from Caisse Popular to purchase another $50,000 in former factory tools which are being sold at auction on April 15.  These assets include the machinery  necessary for the production of Gyro Trac parts and machines.

3.      International is the owner of the license from Denis CIMAF to sell the Gyro Trac cutterhead North America as set forth above. The license is transferrable to the Debtor because the Debtor will be owned by Daniel Gaudreault. International paid $275,000 to maintain the license for 2010.

4.      <u>Receivables from the Debtor</u>. The Debtor owes International for obligations incurred pre-petition in the approximate amount of $85,000. Because BMO successfully prevented the Debtor from using cash collateral on an interim basis, the Debtor quickly ran out of parts stock to sell to potential customers. International has provided parts to those customers directly. Similarly, International has been providing support for the purchase of parts in the first few months of 2010. Moreover, International has paid certain debts of the Debtor to maintain continued operation. As shown by the attached schedule, the Debtor has repaid International for certain parts, but the flow of money has been from International to Debtor, and the Debtor remains in Debt to International for both pre- and post-petition advances.

5.      <u>Capitalization.</u>  Daniel Gaudreault has provided capitalization to International of approximately $250,000.

6.      International has been funding the development of a wood chip baler for current machines that is believed to have a great deal of future value for the company. Two engineers have been working on the design and testing of the machines, and patents are pending. The baler will be sold as an option on new machines and by modification on older machines.

## III.    POST-PETITION ACTIVITY

## A.    Bankruptcy Filing and First Day Motions

The Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on March 17, 2010. Since that time, the Debtor has managed its assets as a debtor in possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code. On March 18, 2010, the Debtor filed a motion to use cash collateral under 11 U.S.C. 363, a motion for an order under 11 U.S.C. Section 105(a), 363(b) and 507(a) authorizing the payment of employee wages, benefits and equipment insurance premiums, and a motion authorizing the payment of adequate assurance to utility providers. A preliminary, emergency hearing was held on the motions on March 22, 2010, and the Court denied interim relief and set the matter for a final hearing on April 5, 2010.

The Debtor informed its employees that they could not be paid as scheduled, but all the

employees agreed to continue to work even knowing it was possible they may never be paid for their labor. To further streamline expenses as much as possible, however, Debtor cut back by six more employees. The Debtor has revised its budget to address the concerns of the court and the interim hearing.

## B.   Companion Cases

In early March 2010, Bank of Montreal moved to appoint receivers in Canada for Gyro Trac, Inc., and Gyro Trac West Coast, Inc.  In order to avoid conflicts between the Canadian cases and the Debtor's case, these two entities filed for relief in this District under chapter 11 on the same day as the Debtor.  The Debtor and related entities each sought and received orders appointing the respective debtors in possession as foreign representative pursuant to 11 U.S.C. §1505.

The Bank of Montreal sought permission from the Canadian Court to take over Gyro Trac, Inc., so that it could liquidate the assets of Debtor.  The Debtor and the affiliated debtors sought to stay that motion pending the reorganization proceedings in this Court.  An emergency hearing was held in Québec on March 24, 2010.

The Canadian Court denied BOM's request to liquidate the assets of the Debtor and its related entities in order to allow the reoganization to proceed in these cases in the United States.

The assets of Gyro Trac West Coast, Inc. are all under lien to the Bank of Montreal.  Upon confirmation of this Plan of Reorganization, the assets of Gyro Trac West Coast, which are under lien to the Bank of Montreal will be surrendered.  Gyro Trac (USA) has two machines which are being held by the receiver for Usitech Nov, and these machines will be returned to the reoganized Debtor.  The Debtor is holding one machine (GT-13), one cutterhead and one French boom that belong to Gyro Trac West Coast, and that equipment will be turned over the BOM at the same time as the Debtor receives its machines.  The only assets of Gyro Trac, Inc. are the shares in Gyro Trac (USA), Inc. and Gyro Trac West Coast, Inc.  Upon confirmation of this Plan of Reorganization, the chapter 11 of Gyro Trac, Inc. will be dismissed.

## IV.   PROPERTY OF THE DEBTOR

Debtor's primary assets on the date of filing consist of the following:

1.      Approximately $80,000 in cash and $430,000 in receivables. These assets are subject to the blanket lien of the Bank of Montreal.

2.      New equipment as listed on the schedules is subject to the $2.9 million floor plan lien

of BB&T.

3. <u>Various used equipment listed in the schedules</u>. These assets are subject to the blanket lien of the Bank of Montreal.

4. <u>Office fixtures, equipment, furnishings</u>. The Debtor estimates the liquidation value at $10,000.

5. <u>Pre-petition litigation claims</u>. The Debtor has a pending claim in Charleston County Court of Common Pleas against Commonwealth Insurance. The Plaintiff's demand in the Complaint seeks $617,000. The Debtor believes it may have a claim against Vermeer Manufacturing relating to the breach of a distributorship agreement. The Debtor may have a claim against Desjardin Capital relating to a breach of financing agreement. Both these potential claims are being investigated. None of the prepetition litigation claims are subject to a properly perfected security interest.

6. The Debtor is in the process of reviewing its financial records with regard to whether the Debtor has any causes of action pursuant to 11 U.S.C. §§ 547, 548, 549, and 550. The Debtor has identified one potential preference claim against Tuttle Dozer Works, Inc. in the amount of $38,000. The Debtor will continue the review of claims to determine if there are any additional claims of this class. These claims are not subject to any security interest.

7. <u>Promissory note from Tremblay & Sons</u>. This note is subject to the blanket lien of the Bank of Montreal. The current balance on this loan is $452,900.

8. <u>Current parts inventory</u>. At filing the Debtor maintained an inventory of parts for sale to dealers and direct sale customers. These assets have been liquidated in the normal course of business and the funds (approximately $72,000) placed in the Debtor's DIP account. These proceeds are subject to the lien of the Bank of Montreal.

9. <u>Miscellaneous stock</u>. The Debtor has throughout the course of its pre-petition operation acquired machine parts which are used for the manufacture of the line of machines. Generally, these parts are not sold directly to customers but used in repair or manufacture of the machines. Many of these parts are obsolete or unusable. The Debtor's books list all the parts and their cost. The cost of these parts over the several years of purchase was $1.3 million. The Debtor has not made a physical inventory of the parts to determine their current value. These parts are subject to the blanket lien of the Bank of Montreal.

## V.    SUMMARY OF PROPOSED PLAN

The Debtor will be merged with Gyro Trac International, with the surviving entity to be known simply as Gyro Trac, Inc.  Stock in the new company will be owned by Daniel Gaudreault who is providing new value through the assets of Gyro Trac International.

The Debtor's claims will be treated as follows:

<u>Class 1.</u> BB&T – Secured, impaired.

The Debtor will retain the new equipment inventory for resale.  The principal balance on each machine will be paid upon sale in the manner set forth the Floor Plan Agreement.  The Debtor will pay interest on the outstanding balance monthly according to the non-default rate (Bank's Prime Rate plus one and one-quarter percent (1.25%) with a five and one-half percent (5.5%) minimum) as provided in the Debtor's promissory note to BB&T.  The interest rate shall be the normal rate as set forth in the note, and not the default rate.

In addition to the monthly interest payment, the Debtor will make payment of the principal balance ("Liquidation Payments"). The Liquidation Schedule provides for payment of the principal amount of the debt in equal payments beginning six months after the Effective Date and continuing for Five years thereafter.  Beginning six months after the Effective Date of the plan and continuing quarterly thereafter, the Debtor will make payments necessary to bring the principal balance of the loan down to the amount of the Liquidation Schedule.  In the event that the principal balance is less than that set forth on the Liquidation Schedule, the Debtor will make no additional payment.  Any Liquidation Payments  made will be applied equally to the outstanding balances on any remaining unsold inventory.

<u>Class 2.</u> Bank of Montreal – Secured claim, impaired.

The Debtor will pay the secured portion ("BMO Secured Debt") of the Bank of Montreal's claim, One Million, Two Hundred Twenty-Three Thousand Dollars ($1,223,000.00),  in equal quarterly payments over Five Years with interest as provided in the Guaranty of Gyro Trac (USA), Inc. (.5 above BMO's prime rate of interest).  The Debtor will retain all of its assets subject to the BMO lien.  The Debtor's affiliate, Gyro Trac West Coast, will surrender all assets in which it has any interest, to the Bank of Montreal on the Effective Date.  BMO will retain a blanket lien against the assets of reorganized Debtor on the effective date in the outstanding principal amount of the BMO Secured Debt.  This lien shall continue to be subordinated to the Floor Plan lien of BB&T, and any future Floor Plan for the purchase of new inventory.

<u>Class 3.</u> Bank of Montreal –  Unsecured claim, impaired.

The unsecured portion of BMO's debt is unliquidated and subject to setoff from the amounts received from the Usitech insolvency proceeding in Quebec and the amounts received from the liquidation of the assets of Gyro Trac West Coast, Inc.  Because the amount of such claims is undetermined and based upon the receipt of post-confirmation payments, the unsecured portion of the BMO is not classified with other unsecured claims.   This class will not receive any payment under the Plan.

<u>Class 4.</u>Pre-petition Employees of the Debtor – Priority unsecured, impaired.

The pre-petition wage claims of the Debtor will be paid 90 percent of their claims 60 days after the Effective Date.

<u>Class 5.</u> Claims of Insiders – Unsecured, impaired.

This class consists of claims of Gyro Trac, Inc., Gyro Trac West Coast, Inc., and PricewaterhouseCoopers, Inc., as receiver for Usitech Nov, and Gyro Trac International.  These claims will not be paid.

<u>Class 6.</u> General Unsecured Claims –  Unsecured, impaired.

The General Unsecured claims consist of all scheduled or allowed unsecured claims which are not otherwise provided for in this Plan and are in excess of $1,000.  The Debtor will pay a total of $200,000 in four equal installments of $50,000 beginning one year after the Effective Date and continuing thereafter in six month intervals. General Unsecured Claims, which will be paid pro rata the allowed amount of their claims.

<u>Class 7.</u>  De Minimus Unsecured Claims – Unsecured, impaired.

The de minimus claims are all general unsecured claims in amounts less than $1,000.  The Debtor estimates there are approximately 30 such claims.  The de minimus claims will be paid at rate of 75 percent of their allowed amount within 90 of the Effective Date.

<u>Class 8.</u>  Rejected dealer contracts –  Unsecured, impaired.

All claims arising from the rejection by the Debtor of dealership agreements.  The amount of such claims is unliquidated and unknown.  These claims will not receive any distribution under the plan.  However, in as much as these dealers have new inventory purchased directly from Gyro Trac, the Debtor will repurchase new equipment inventory (defined as less than 50 hours of use) at dealer net cost and new parts inventory at 85 percent of dealer cost. These repurchases will be made

within one year after the Effective Date. The Debtor will honor warranty claims made by their customers through the dealer on machines sold to dealers prepetition up to the amount of the replacement cost of the parts.

Class 9. Utility Claims – Unsecured, impaired.

All pre-petition Utility Claims which are not paid under the Debtor's pending motion to pay will be paid at a rate of 90 percent of their allowed amount within 90 days of the Effective Date.

Class 10.  Administrative Claims – Priority, unimpaired.

This class consists of the administrative claims of the Debtor's attorneys and other professionals, quarterly fees of the United States Trustee, and any unpaid post-petition operating expenses. Professional fees incurred through the date of confirmation will be paid only after court approval. After court approval, where necessary, these expenses will be paid in full from the estate.

Class 11. Equity – Unsecured, impaired.

The owner of the Debtor's stock, Gyro Trac, Inc. shall receive no payment on behalf of its claim.

## VI.    LIQUIDATION AND OTHER ALTERNATIVES TO PLAN CONFIRMATION

There are three possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Debtor's Bankruptcy Case; (b) the Bankruptcy Court could consider an alternative plan of reorganization or orderly liquidation, or (c) the Debtor's Bankruptcy Case could be converted to a liquidation case under Chapter 7 of the Bankruptcy Code. These alternatives are described briefly below.

**Dismissal**

Were the Debtor's Bankruptcy Case dismissed, the Debtor would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code. The Debtor's primary secured creditors would be expected to immediately exercise their rights as secured creditors to foreclose and seize the Debtor's assets.  There would be no assets available for the distribution to unsecured creditors.  All employees would lose their jobs.  Customers who own Gyro Trac machines would have difficulty find service and replacement parts.

**Confirmation of an Alternative Plan**

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan. If an alternative plan were proposed, it would more than likely be

substantially similar to the current Plan in that it would propose to keep secured creditors unimpaired. Unlike the current plan, however, it would also likely contemplate the liquidation of the Debtor's few remaining Assets and the distribution of cash to creditors of descending priority, and eliminate the Debtor's business as a going concern. The Debtor believes that the Plan described herein enables the Creditors and all parties-in-interest to realize the best payout under the circumstances and any other alternative plan would not likely provide any greater return to Claimants.

## Chapter 7 Liquidation

In the event of a liquidation, the secured lenders would receive the auction value of the assets after the payment of the costs of administration for a Chapter 7 and the Trustee's fees.  Based upon the liquidation values as projected by the Debtor's schedules, BB&T would receive only $2.5 million on its secured claim of $2.9 million.  Under the plan, BB&T's entire Floor Plan debt will be paid with interest over the next three years.

In a liquidation, BMO would receive $1,245,900.  This is comprised of $411,000 in receivables, $200,000 in miscellaneous parts, Promissory Note due from Tremblay and Sons, LLC in the outstanding principal amount of $452,900; cash from postpetition sale of parts inventory $45,000; cash in accounts at filing of $80,000; $57,000 receivable from sale of used equipment by an auction company.  Under the plan of reorganization, the Debtor will pay cash to BMO in amounts necessary to pay off the secured claim with interest.  Further, BMO will receive the collateral abandoned under the Plan.

The Plan will provide payment for unsecured claimants in amounts equal to the value of the unsecured assets.  Moreover, priority employee creditors, Utility claims and certain de minimus claims will be paid a significant percentage of their claims within 90 days of filing.  These sums would not be available in a liquidation.  Because the Plan contemplates that: (i) the Bankruptcy Court's involvement will diminish substantially after the Effective Date and (ii) the Debtor's counsel, who is already familiar with the Assets of and Claims against the Estate, shall continue the process of Claims resolution, without the necessity for additional investigation by a Chapter 7 Trustee and his/her separate new professionals, there will not be an additional layer of administrative expenses. In addition to the sale proceeds available through the Plan, the Plan also offers the opportunity of avoiding additional administrative costs and delays that would result from a Chapter

7 liquidation.

At a minimum, a Chapter 7 Trustee would retain his/her own counsel, who would ordinarily need to devote a substantial amount of time reviewing the status of Claims and getting up to speed on various matters. Such review would include a substantial amount of time duplicating tasks previously performed by other Professionals in the case, thereby increasing both the costs and the time necessary to liquidate the Estate. Also, the statutory fee paid to the Chapter 7 Trustee would further deplete the Estate.

If this case were converted to a Chapter 7 proceeding, cash distributions, if any, would be delayed for months because the Bankruptcy Court is required to establish an additional bar date for filing proofs of Claim against the Estate. Upon conversion to Chapter 7, unsecured creditors are given additional time to file Claims and governmental authorities are provided even longer to file their additional proofs of Claim. Upon expiration of the Chapter 7 bar dates, particularly given the high number of creditors in this case, the Chapter 7 Trustee and/or his attorney would likely require considerable time to review the Claims and undertake the Claims resolution process. Thus, not only would any dividends paid to creditors suffer because Chapter 7 professional fees would be paid at the expense of these Claims, but unsecured creditors would actually have to wait months longer for any distribution. Consequently, the Debtor believes that the Plan's lower total administrative costs and the more expeditious process of remaining in a Chapter 11 combine to result in higher recovery for creditors than a Chapter 7 liquidation could ever offer.

## VII.   FEASIBILITY OF THE PLAN

It is provided in 11 U.S.C. §1129(a)(11) that in order for a Plan of Reorganization to be confirmed, it must be demonstrated that the Plan of Reorganization is not likely to be followed by a liquidation or the need for further reorganization of the Debtor or any successor of the Debtor under the Plan unless the liquidation or reorganization is proposed in the Plan of Reorganization. The Debtor believes the Plan is feasible based upon conservative projections of sales and expenses.

As set forth in the proposed operating budget for the reorganized Debtor, the Debtor has ample capital to make payments due under the Plan.

The primary reasons for the Debtor's cash flow problems in the year preceding the bankruptcy were:

1.        The seizure by the Bank of Montreal of sales proceeds from the sale of four new

machines, in excess of $450,000 (CND).

2.    The payment of in excess of $500,000 on prepetition product liability settlement claims.

3.    The seizure by the Bank of Montreal and other creditors of Usitech NOV, the Debtor's main supplier of parts and inventory.

4.    The associated legal and administrative costs of product liability litigation and defense of claim by BMO.

5.    The costs of preparing equipment for the Vermeer distribution deal.

All these costs will be eliminated or limited under the plan of reorganization.  Even with these costs the Debtor was able to reduce secured lending under the Floor Plan by more than $2.5 million in the five quarters prior to the filing in this case.

The Debtor's new supply line will be the factory which is being purchased through Gyro Trac International.  International has or will purchase the assembly line facility in Quebec with financing from Caisse Popular, which has been approved.  This factory will produce new machines for sale by the Debtor.  The Debtor will also obtain parts from the reorganized machine shop which was purchased from the Usitech Nov insolvency by the Labbe family.

The company has new infusion of capital from the new owners. The company will receive all the assets of Gyro Trac, International, Inc., which include the Canadian manufacturing facility, which will be able to produce parts for resale at a significantly decreased price.

The Debtor has rejected the contracts of dealers who have prevented the direct sale of parts to the customers.  The Debtor anticipates increased income from equipment and parts sales as a result of these rejections to be significant.  The Vermeer related dealers have been rejected and the Vermeer distribution deal is at an end.

The value that the Debtor retains as a going concern increases substantially the value of the collateral so that sales can be made in excess of the lien of BB&T.  The projections of future sales indicates that future sales will be in excess of those need to fund the plan.   The Debtor will assume beneficial contracts as set forth more fully in the Plan.

The reorganized Debtor will have decreased expenses.   Gyro Trac has cut employees and operational costs dramatically over the past two years.  These reduced expenses will help insure the feasibility of the Plan.

## VIII.    TAX CONSEQUENCES

The Debtor believes there are no adverse tax consequences to the Debtor or its creditors as a result of the bankruptcy and the provisions of the Plan but all creditors and parties in interest should consult their respective accountants and/or tax attorneys.

## IX.    CONCLUSION

The Creditors and readers of this Disclosure Statement are directed to the Plan of Reorganization for specific treatment of their particular claims against the Debtor. The provisions of the Plan satisfy all undisputed claims against the Debtor.

**RESPECTFULLY SUBMITTED** on this the 2nd day of April, 2010, at Charleston, South Carolina.

THE CULVER FIRM, P.C.

/s/ Robert Culver
Robert E. Culver, Esq.
Fed. Id. No.: 7289
575 King Street, Ste. A
Charleston, SC 29403
Email: bob@culverlaw.net
Phone: 843-853-9816
Facsimile: 843-853-9838