# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF SOUTH CAROLINA

IN RE:

       Gyro Trac (USA), Inc.,

                 Debtor.

Case No. 10-09108
Chapter 11

## SECOND AMENDED DISCLOSURE STATEMENT

Filed by the Debtor-in-Possession on June 4, 2010

### Table of Contents

| | | Page |
|---|---|---|
| I. | Introduction | 2 |
| II. | History and Events Leading to Bankruptcy | 3 |
| III. | Post-Petition Activity | 14 |
| IV. | Property of the Debtor | 15 |
| V. | Summary of Proposed Plan | 18 |
| VI. | Liquidation Analysis | 21 |
| VII. | Feasibility of Plan | 23 |
| VIII. | Tax Consequences | 25 |
| IX. | Conclusion | 25 |

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 1 of 26

## DISCLOSURE STATEMENT

### I.    INTRODUCTION

Gyro Trac (USA), Inc. (the "Debtor") provides this Amended Disclosure Statement to all of its known creditors in order to disclose information considered by the Debtor to be important, material and necessary for the creditors to make a reasonably informed decision in exercising their right to vote on the Plan of Reorganization of the Debtor (the "Plan") which has been summarized herein and will be filed with this Disclosure Statement in the United States Bankruptcy Court for the District of South Carolina. This Disclosure Statement must provide such information, as far as practicable, that would enable a hypothetical investor typical of the holders of claims against the Debtor, to make an informed judgment about the Plan. The Debtor feels that the information provided in this Disclosure Statement gives information which is adequate for an investor to make such a decision. The United States Bankruptcy Court will set a hearing to determine if this Disclosure Statement provides adequate information and conforms to the requirements of the Bankruptcy Code (11 U.S.C. §101 et seq.).

The United States Bankruptcy Court will set a date at a later time for a hearing on the acceptance of the Plan or may combine the Disclosure Statement and Plan hearing. Notice of the hearing will be mailed to all holders of claims, and upon receiving the Notice of Hearing, holders of claims may vote on the Plan by completing the ballot mailed with the Plan and Notice of Hearing and then returning the ballot to the Bankruptcy Court. The Notice of Hearing will specify a time within which the ballots must be returned. The vote of all creditors and holders of claims is very important. The Plan will be confirmed by the Court if it is accepted by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the creditors or holders of claims in each class voting on the Plan, and two-thirds (2/3) in number of the holders of allowed interests voting on the Plan. In the event the requisite number of acceptances are not obtained, the Court may still confirm the Plan if the Court finds the Plan accords fair and equitable treatment to those classes rejecting the Plan.

Pursuant to Local Bankruptcy Rule 3003, the bar date for the filing of claims for non-governmental entities is July 29, 2010, and the bar date for claims by governmental agencies is

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 2 of  26

September 13, 2010. Any claims not filed, or scheduled as liquidated and undisputed in the Debtor's schedules, will be barred and discharged under the Debtor's plan of reorganization.

The Debtor reserves the right to object to any claim prior to the closing of the case. The Debtor also reserves its right to bring any potential avoidance actions pursuant to 11 U.S.C. §§ 547, 548, 549, and 550.

The Plan represents a legally binding arrangement and should be read in its entirety, rather than relying on the summary in this Disclosure Statement. Approval of the Disclosure Statement by the United States Bankruptcy Court does not constitute approval by the Bankruptcy Court on the merits of the Plan.

EXCEPT WHERE SPECIFICALLY STATED OTHERWISE, THE DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR AND HAS BEEN PREPARED BASED ON INFORMATION AVAILABLE TO THE DEBTOR. NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY THE VALUE OF THE ASSETS OF THE DEBTOR) ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY.

## II.    HISTORY OF THE DEBTOR AND EVENTS LEADING TO THE FILING OF BANKRUPTCY

### A.    General Background of the Gyro Trac entities.

The Debtor is a South Carolina corporation engaged in the business of sales and service of forestry equipment, particularly brush cutters and their parts and accessories. Debtor and its affiliates developed and designed Gyro-Trac products over the past 15 years. The brush cutter is a single-purpose, rubber-tracked conveyance with cutter-head attached in the front. Through the spinning motion of the drum and the unique arrangement of the cutting teeth, the brush cutter is able to take down trees and brush and quickly turn it into mulch without destroying the surrounding environment. What would have previously taken several workers and varying types of equipment could now be completed more quickly with one Brushcutter and one operator. Gyro-Trac brush cutters were among the first on the market to use a technology that mulches trees and other debris in to wood

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 3 of  26

chips, thereby reducing the need for costly hauling and waste disposal in land clearing. Gyro-Trac products are specialty products which require specialized skill and training for optimum operation and efficient maintenance for which Debtor and its affiliates are the only resources. The market still has few different brands and is essentially a boutique market unique from other heavy equipment industries.

The concept for Gyro-Trac equipment originated with Daniel Gaudreault and his brother, who were in the land clearing and forestry business in northern Québec. The brothers developed a specialized brushcutter for land clearing for their own use, but upon being observed by other land clearing business owners, demand for additional machines grew, and the brothers began building brushcutters for resale. Over the past two decades, the products have improved and developed into a product line that currently markets the GT-13XP, GT-25XP, GT-40, GT-60, and individual cutter-heads for use on a basic skid steer.

In the late 1990s, Daniel Gaudreault moved his young family to South Carolina to begin establishing a business for Gyro-Trac in the United States, while his brother remained in Québec to oversee those operations and production. In or around 2005, Daniel bought out his brother's interest in Gyro-Trac, and the various Gyro-Trac interests were organized into three corporations. The holding company, Gyro-Trac, Inc., presently owns 100% of the Debtor's stock, and it is the debtor in possession in a related case filed under title 11, South Carolina Bankruptcy Court Case 10-1909dd. Gyro-Trac, Inc. also holds 100% of the stock of Gyro-Trac West Coast, Inc., a Canadian affiliate of the Debtor who performed similar operations as Debtor, but in western Canada. Daniel Gaudreault owns 70% of the stock of Gyro-Trac, Inc. while Desjardins capital de risque/Innovatech ("Desjardins") owns 25 %. Steve Quirion owns the remaining 5%. Gyro-Trac West Coast, Inc. ceased operations on November 30, 2009, and is also a debtor-in-possession in a related case filed under Title 11, South Carolina Bankruptcy Court Case 10-1910dd.

Beginning in 2005, the equipment, accessories and parts sold by the Debtor and Gyro- Trac West Coast were manufactured or obtained for Debtor by a Québec company known as Usitech NOV, Inc. ("Usitech"). Usitech was a Canadian corporation of which the majority of the stock was owned by a family trust for the Labbé family (who had owned Usitech prior to its incorporation) with

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 4 of  26

the minority ownership interests being held by Daniel Gaudreault and two other individuals. Usitech was the sole source of equipment and parts for Debtor from 2005 until December 2009, when Usitech was forced into receivership in Québec. PricewaterhouseCoopers, Inc. was appointed as a receiver for a portion of the Usitech debt. The Debtor owes an unsecured debt of approximately $3.2 million to Usitech.

### B.    Intellectual property

The current unique cutter-head technology used by Gyro-Trac is subject to a patent held by Denis CIMAF and is used by Gyro-Trac under license from Denis CIMAF. In December 2008, Gyro-Trac, Inc. and Denis CIMAF reached a universal settlement agreement of various lawsuits between them involving some of their previous agreements. As part of this settlement, Denis CIMAF granted Gyro-Trac a license for Gyro-Trac's exclusive use of the technology in North America for all equipment except excavators. The use of this license, however, is contingent upon several conditions. Gyro-Trac must pay an annual license fee that increases each yearof the agreement. Under the December 2008 agreement, the license fees were to be paid in advance annually and received by Denis CIMAF's attorney no later than December 1st prior to each year during the term of the agreement. The annual license fee due to Denis CIMAF in December 2009 was in the amount of $275,000.00 (CND). Another condition of the license is that it may only be owned by a company in which Daniel Gaudreault has a controlling ownership interest, which essentially makes the license personal to Daniel Gaudreult. The term of the license is five years and license payments are as follows:

First Year: Due 12/12/2008 = $150,000 (CND), then $100,000 (CND) due 7/1/09

Second Year: Due 12/1/2009 = $275,000 (CND)

Third Year: Due 12/1/2010 = $302,500 (CND)

Fourth Year: Due 12/1/2011 = $400,000 (CND)

Fifth Year: Due 12/1/2012 = $450,000 (CND)

The original license is subject to a confidentiality agreement. Any party wishing to view the entire license may do so upon the entry of an acceptable confidentiality agreement and order. Any party interested in viewing the license should contact Debtor's counsel.

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 5 of 26

### C.    Failed Dealership agreements

When Daniel Gaudreault moved to South Carolina, Debtor began pursuing the United States market through the use of direct sales, adding salesmen and service technicians to travel throughout the United States based upon demand. As the sales of the machines grew, however, Debtor began to enter dealership agreements with heavy equipment dealers throughout the United States. One of these dealerships ended in a legal dispute that is one of the chief precipitating factors of the Debtor's insolvency. In 2007, Right Of Way Maintenance Equipment Company ("ROWMEC") of Texas obtained a judgment of approximately $3.6 million against the Debtor and Gyro-Trac, Inc. based upon an alleged breach of the dealership agreement. Gyro-Trac, Inc. and Debtor posted a bond to stay collection pending appeal based upon a letter of credit issued by the Bank of Montreal ("BMO"). The judgment was affirmed on appeal, and in early 2009, BMO paid ROWMEC $3.6 million upon its demand pursuant to the letter of credit. Apparently, the payment under the letter of credit did not satisfy the judgment interest owed to ROWMEC. In Summer 2009, ROWMEC filed for Chapter 11 protection in the United States Bankruptcy Court for Southern District of Texas in Houston, and has subsequently filed two adversary proceedings against Debtor and Gyro-Trac, Inc. for recovery of this interest on the 2007 judgment. On March 11, 2010, the Texas Bankruptcy Court entered summary judgment in favor of ROWMEC against Debtor and Gyro-Trac, Inc. in the amount of $320,599.91 for the unpaid judgment interest.

Even though the relationship with ROWMEC did not work out, demand for Debtor's product at that time dictated that Debtor continue to pursue dealership relationships with other entities throughout the United States so that Debtor could meet obligations of the market and its customers. Debtor ultimately granted several individual Vermeer dealers exclusive dealer appointments for the Southeast, Texas, the Midwest, Southern Ohio, Minnesota and portions of the United States' west coast. Debtor also entered into a dealer agreement with the Vermeer dealer in Australia while sales and service in western Canada shifted from Gyro-Trac West Coast to Vermeer Canada. In late 2007, Vermeer Manufacturing ("Vermeer") approached Debtor about a possible joint venture going forward, and in or around August 2008, Debtor entered into a distribution agreement with Vermeer. The sum of these relationships would become another precipitating factor for Debtor's financial

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd                        Page 6 of 26

problems.

The distribution agreement and discussions with Vermeer were supposed to result in Debtor being able to offer its products in approximately 300 domestic Vermeer retail outlets plus additional international venues.  Additionally, Vermeer and Debtor began working together to develop a co-branded product for distribution through Vermeer's dealer network. As part of this process, Debtor spent in excess of $1 million in testing and modifying the GT-25XP for use as a future co-branded product.  This was a huge commitment from Debtor because the GT-25XP had been its "flagship." In reliance on representations by Vermeer, Debtor entered into this risk.

As a result of the dealer agreements and the distribution agreement, Debtor's ability to make direct sales was severely limited and Debtor had to rely on the dealers for sales of both equipment and parts.  Debtor's sales team stopped making direct sales and began providing dealer support in getting the dealers up to speed and assisting the dealers' salespersons in making sales to customers. Debtor's service and parts department went from working directly for Gyro-Trac equipment owners to providing training and support for the dealers who then assisted the customers.  Debtor began to see its profit margin drop somewhat because of the difference between selling retail and selling wholesale, but the Debtor expected to recover swiftly based on increased exposure through the dealers.

Meanwhile, Debtor worked diligently to complete the project of getting the co-branded GT-25XP ready for production, and completed 99.9% of this project by January 2009. While Debtor was meeting its obligations to Vermeer, Vermeer apparently began to waiver on previous representations as to how the future relationship between Debtor and Vermeer would proceed. Debtor did not become aware of Vermeer's change in position until after substantially all of the work on the new GT-25XP had been completed.  In Spring 2009 Debtor and Vermeer spent much time in negotiations and discussions about the future of their relationship. During that time and perhaps as early as Fall 2008, the dealers' sales activity slowed, in part because of the ambiguity of where the Debtor-Vermeer relationship was headed.  This was not known by Debtor, however, until much later. While a slowing economy may have been partly to blame, the dealers' sales appeared to be off by much more than could be attributed solely to the declining economy.

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 7 of  26

Discussions between Debtor and Vermeer continued, and in late spring 2009, it appeared to Debtor that the issues had been mostly resolved and the relationship would go forward, when suddenly, at the end of May 2009, Vermeer sent Debtor a notice of termination of the distribution agreement.  Thereafter, there were new indications that Vermeer would still be willing to talk about a long-term relationship with Debtor, but ultimately, no resolution was made.  After spending millions of dollars in preparation for the new arrangement and virtually eliminating its own direct sales and service operations, Vermeer had reneged on the deal, leaving Debtor without an active sales force and bound by restrictive dealer agreements.

The continued existence of these dealer agreements has been another factor in the Debtor's precarious financial position by limiting Debtor's ability to make direct sales while dealers were also generally not pursuing sales of Gyro-Trac product. When dealers sold inventory, they did not order replacements from Debtor. The dealer agreements prohibited Debtor from pursuing direct sales in some of what had historically been Debtor's most profitable territories.  The Debtor has rejected these contracts, and the reorganized Debtor plans to make sales and service directly or through contractors reclaiming its previous markets from the dealers.  This is expected to provide a significant increase in profit from the sale of equipment.

### D.    Other circumstances leading to the filing of bankruptcy

Additional precipitating factors were two lawsuits arising out of two independent sales of equipment.  In February 2009, the District Court for South Carolina entered judgment in favor of Thunder Bay Tree Service, LLC in the amount of $660,000 following a jury verdict in June 2008. Debtor reached a settlement in the second suit in March 2009, but that settlement required Debtor to pay a significant amount of cash up front as well as make significant monthly payments for a period of two years.  Debtor has paid approximately $480,000 towards settlement since March 2009. Although Debtor appealed the Thunder Bay decision, which was still pending at the time of Debtor's filing, in early March 2010, Thunder Bay seized eight new GT-25XPs pursuant to a writ of execution on its 2009 judgment. That equipment is all subject to lien by BB&T and/or BMO.  The Debtor demanded the return of the machines, and they were returned in April.

In the best of economies, these tribulations would be trying, but Debtor's market has suffered

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 8 of  26

severely in the recent economic climate and has been beset by the general economic downturn resulting in a depressed market for new equipment as well as parts.

During the past year, Debtor's revenues from both the sale of equipment and the sale of parts were significantly lower than Debtor enjoyed over previous years. Gross revenue in 2007 was approximately $24 million and in 2008 approximately $15 million, but in 2009 gross revenues were only approximately $6.7 million. Current, short term assets decreased between 2008 and 2009 by approximately $3.1 million, but current, short term liabilities in 2009 increased by approximately $10.2 million over that in 2008. Bad debts increased between 2008 to 2009 by approximately $850,000.

Even with the dealership issues and the economic slump that has hit the land-clearing forestry business particularly hard, the Debtor made significant sales in the past year. The Debtor generated gross income from sales of new machines and parts of $5.6 million. This led to the scheduled repayment of the debts of BB&T and payment to BMO of approximately $450,000 and the payment on lawsuit settlements of approximately $480,000.

Debtor's largest secured debts are owed to BB&T and BMO. The debt to BB&T arises from floor plan financing of new equipment. The debt to BMO arises out of debt owed by Gyro-Trac West Coast to BMO for which Debtor is a guarantor, with much of that debt originating in the letter of credit paid to ROWMEC in early 2009. Decreased revenues in 2009 appear to be a result of economic downturn and the situation with Vermeer and the dealers. The Vermeer/dealer situation can be resolved by rejection of the dealer agreements and pursuit of direct sales. Cash flow should increase by virtue in the change of credit terms for Debtor's customers to match those being required of Debtor by its suppliers.

### E.    History of Gyro-Trac International, Inc.

During Fiscal Year 2009, the Debtor made most of its equipment sales to dealers, including selling four machines to its affiliate Gyro-Trac West Coast for resale to a customer in Benin, Africa. International banking and overseas shipping requirements made the transaction with Benin complicated, involving an international letter of credit. To facilitate this transaction, terms of the floor plan agreement required Debtor to pay off the BB&T liens on the equipment when it was sold

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd                                          Page 9 of  26

to Gyro-Trac West Coast, even though Gyro-Trac West Coast did not repay Debtor until Gyro-Trac West Coast received payment from the Benin Customer. When the Benin customer sought to purchase four more machines a couple of months later, BMO refused its consent to the logistics which would permit completion of the sale. Further, shortly after the proceeds from the first sale were received by Gyro-Trac West Coast, BMO seized the new proceeds in an amount in excess of $425,000 (CND).

To address this problem, in August 2009, Daniel Gaudreault formed a new corporation, Gyro-Trac International, Inc., of which he was the sole shareholder, for the purpose of facilitating future sales like that to Benin. The general idea was that Gyro-Trac International would buy the equipment from Debtor or Gyro-Trac West Coast and then re-sell it to Benin (or other international customer). Customer would then pay Gyro-Trac International. In this scenario, Gyro-Trac International rather than the banks would bear the risk of loss should the international customer refuse to make payment after the equipment had been shipped.

At the same time that Debtor was involved with negotiations with Vermeer, in or around early 2009, Debtor entered into discussions with BMO for the restructuring of the overall debt of Debtor and the other Gyro-Trac entities as well as Usitech. Negotiations continued and ultimately the parties reached a consensus and closing of the financial restructuring was scheduled for late October 2009. As part of this process, various parties had to give their agreement and Desjardins and Daniel Gaudreault had to agree to contribute additional cash. All parties had agreed and were prepared to move forward with closing when suddenly, Desjardins made additional, unreasonable demands on which consensus could not be reached. Desjardins' actions caused the financial restructuring that Debtor, BMO and others had worked on for many months to collapse. Usitech was forced into receivership in early December 2009. BMO seized certain assets of Gyro-Trac West Coast, in addition to cash in the amount of approximately $450,000, which they had attached earlier in the year. Further, BMO also seized certain assets of the Debtor which were located in Québec.

Usitech had been Debtor's sole supplier for more than 4 years, and the receivership in December 2009 left Debtor with no source for parts going into the busy west Canadian season. Usitech completely shut down in mid-December 2009, and the new entity, Usitech Nov Industries,

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 10 of  26

opened in mid-January 2010.  In mid-December 2009, Debtor was forced to find new sources for parts, many of which are unique to Debtor's product and not produced by anyone but Usitech. Debtor turned to Gyro-Trac International to replace Usitech as the supplier.  Gyro-Trac International sought to establish new sources but because of the Usitech situation and the cultural effect of that situation in Canada, most all parts or portions of parts had be bought pre-paid.  As a result, Debtor was also required to pre-pay its parts much of the time.    Meanwhile, one of the dealers fell significantly into arrears on its parts account with Debtor.  When Debtor received the parts, the dealer was not able financially to purchase them  from Debtor and contractual restrictions prohibited Debtor from selling the parts directly to the dealer's customers.  These situations coupled together to severely limit Debtor's cash flow over the four months immediately proceeding filing. As of the date of filing, Debtor had converted all parts accounts to pre-payment or COD rather than the net-30 terms previously offered.

Gyro-Trac International provided a solution to another imminent problem fast approaching Debtor at the end of 2009.  When the financial restructuring plan with BMO fell through at the end of October 2009, the annual license fee to Denis CIMAF was due less than five weeks later. Essentially, Debtor had just been betrayed by its own holding company when Desjardins caused the financial restructuring to collapse by backing out. The license, however, is essential for the production and continuation of the current and future Gyro-Trac products.  A private source agreed to help in making the license fee payment but only if Desjardins was not involved.  The money for the license payment was loaned to Gyro-Trac International, who received assignment of the license agreement on October 28, 2009.  Gyro-Trac International was able to negotiate with Denis CIMAF for an extension on the payment due date. Gyro-Trac International paid the 2010 license fee, thereby ensuring Debtor its continued use.

F.    **Merger with Gyro Trac International, Inc.**

Under the proposed plan of reorganization, the assets of Gyro-Trac International will be merged with the Debtor to form the surviving entity. Gyro Trac International has assets as follows:

1)    <u>Manufacturing Assembly Line</u>. Gyro-Trac International presently is completing the purchase of the former Usitech assembly line facilities in Ste. Justine, Québec.  Caisse Popular, the

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 11 of  26

original secured lender to Usitech on this same facility, has approved the sale to Gyro-Trac International and will be providing financing in the principal amount of $413,000 (CND) to Gyro-Trac International to facilitate this transaction. Gyro-Trac International has received the final closing documents, is in the process of reviewing, executing and returning them to Caisse Popular, and anticipates that the closing will be fully consummated within days. Repayment of this loan is to be made over a period of 132 months, with payments of interest only for the first 11 months immediately following completion of the closing, then monthly payments of principal plus interest for the remainder of the loan term. Interest is variable and calculated at the bank's prime rate plus 3 percent. Caisse Popular's loan is secured by a first-position security interest on the land and building, as well as contents of the building plus a personal guaranty by Daniel Gaudreault in the amount of $35,000 (CDN). Gyro-Trac International is expected to pay closing costs in an amount of approximately $9,000 (CDN). In addition to the loan, Daniel Gaudreault has personally contributed $45,000 toward the purchase. In addition to procuring the manufacturing facility, Gyro-Trac International has purchased parts for the factory in the amount of $58,461.07, (CND) and these parts will be used to produce new machines when the current inventory is exhausted.

2)     _Receivables from the Debtor._ Debtor owes Gyro-Trac International for obligations incurred pre-petition in the approximate amount of $85,000. Because BMO successfully prevented the Debtor from using cash collateral on an interim basis immediately following its filing for Chapter 11 protection, the Debtor's ability to purchase parts for resale to potential customers was halted and Debtor did not have certain parts in stock to sell to customers. Gyro-Trac International has provided support for the purchase of parts for resale by Debtor during the period since Usitech went into receivership in December 2009 and immediately following Debtor's filing. Gyro-Trac International also has paid certain debts of the Debtor to help Debtor maintain continued operation since December 2009. The Debtor has repaid Gyro-Trac International for certain parts. However, regardless of any payments from Debtor to Gyro-Trac International, all the assets of Gyro-Trac International have been used for the benefit of Debtor, and Debtor remains in debt to International for both pre- and post-petition advances. See Schedule D.

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure Stmt\Second amended Disclosure Statement Final\disclosure statement.amended.consolidated.060310.11am.wpd

Page 12 of  26

3)    <u>Capitalization.</u>  As of the time of filing, Daniel Gaudreault had provided funds to Gyro-Trac International in the amount of approximately $200,000.  Daniel Gaudreault has continued to provide  funds to Gyro-Trac International to fund operations following Debtor's filing, including paying wages to the former operations manager and engineer of Usitech who lost their positions when Usitech went into receivership but are essential for the manufacture and design of Debtor's products.   In the Plan of Reorganization, Gaudreault's contributions will be denominated as "capital," and any security interest previously granted to him by Gyro-Trac International will be cancelled.  All other pre-petition liens against Gyro-Trac International and Debtor will continue in the assets of the reorganized debtor, excepts as altered by the plan of reorganization.   The first-position security interest of Caisse Popular on the assets for the Ste. Justine manufacturing facility will be retained by the reorganized debtor and maintain its first position on those particular assets.

4)    <u>Denis CIMAF License.</u>  Gyro-Trac International is the present holder of the Denis CIMAF license which permits Debtor to sell Gyro-Trac products in North America as more fully set forth above.  The license is transferrable to the reorganized debtor because Daniel Gaudreault will own  the reorganized debtor. Gyro-Trac International paid approximately $275,000 (CDN) to maintain the license for use during 2010.

5)    <u>New Technology and Intellectual Property.</u>  Gyro-Trac International has been funding the development of a woody biomass baler for use with the GT-25XP Brushcutter that is believed to have a great deal of future value. The baler is an attachment for the GT-25XP which facilitates capturing and baling of the wood chips created through mulching.  The resulting bales can then be sold as biomass and owners can recapture some of their costs.  The demand for wood chips has been escalating with development of biomass energy sources.  Gyro-Trac International has been working on the development and testing of the baler attachment, and patents are pending.  When issued, the patent on this technology will be owned by Daniel Gaudreault personally and licensed to Gyro Trac International or the reorganized Debtor.  The baler will be sold as an option on new machines and as an upgrade to older machines with certain modifications.

**(2)    Business Plan**

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure Stmt\Second amended Disclosure Statement Final\disclosure statement.amended.consolidated.060310.11am.wpd

Page 13 of  26

The Reorganized Debtor will be managed by current insiders and current employees of Debtor and Gyro-Trac International. Daniel Gaudreault will be the sole director and president of the reorganized Debtor. The officers of company will be (1) Wendell DeVries, vice-president of sales, (2) Melissa Gaudreault Hatcher, general manager, (Mrs. Hatcher is Mr. Gaudreault's cousin), (3) Jennifer Queen, general counsel, (4) Steve Quirion, chief financial officer. The salaries of these officers will be at the level of compensation they were receiving immediately prior to the bankruptcy filing. These salaries previously had been reduced by 20 percent prior to filing as part of a cost-savings mechanism employed by Debtor, and that reduction will continue post-confirmation until the reorganized debtor's finances are deemed sufficient to support full salaries.

The reorganized debtor will continue to liquidate its current inventory using the net proceeds from that liquidation to make payments under the Plan and fund ongoing operational costs, including without limitation purchasing raw materials and funding manufacturing of Gyro-Trac products. The Debtor anticipates that its current inventory of GT-25XP machines will be liquidated within two years.

Going forward, inventory will be reduced dramatically. The current high inventory levels are a result of the failed distribution agreement with Vermeer. The Vermeer Agreement required the increase in standing inventory which was to be purchased by Vermeer dealers. When Vermeer reneged on the deal, Gyro Trac was stuck with high inventory levels. The reorganized debtor will hold very low levels of inventory, and the machines will be produced based upon orders by customers. Debtor presently estimates that it will begin manufacturing in fiscal year 2011. The cost to manufacture the machine will be comparable to the costs that Gyro Trac was paying to Usitech. The Debtor's projections for operations, including beginning manufacturing, are set forth in the projections attached hereto as Exhibit C.

## III.    POST-PETITION ACTIVITY

### A.    Bankruptcy Filing and First Day Motions

The Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on March 17, 2010. Since that time, the Debtor has managed its assets as a debtor in possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code. On March 18, 2010, the Debtor filed a

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 14 of  26

motion to use cash collateral under 11 U.S.C. 363, a motion for an order under 11 U.S.C. Section 105(a), 363(b) and 507(a) authorizing the payment of employee wages, benefits and equipment insurance premiums, and a motion authorizing the payment of adequate assurance to utility providers.  A preliminary, emergency hearing was held on the motions on March 22, 2010, and the Court denied interim relief and set the matter for a final hearing on April 5, 2010.

The Debtor informed its employees that they could not be paid as scheduled, but all the employees agreed to continue to work even knowing it was possible they may never be paid for their labor. To further streamline expenses as much as possible, however, Debtor cut back by terminating six more employees. The Debtor then revised its budget to address the concerns of the court and the interim hearing.   Following the hearing on April 5, 2010, the Court entered an order permitting Debtor to use cash collateral.

### B.    Companion Cases

In early March 2010, BMO moved to appoint receivers in Canada for Gyro-Trac, Inc., and Gyro-Trac West Coast, Inc.  In order to avoid conflicts between the Canadian cases and the Debtor's case, these two entities filed for relief in this District under Chapter 11 on the same day as the Debtor.  The Debtor and related entities each sought and received orders appointing the respective debtors in possession as foreign representatives pursuant to 11 U.S.C. §1505.

BMO sought permission from the Canadian Court to take over Gyro-Trac, Inc., so that it could liquidate the assets of Debtor.  The Debtor and the affiliated debtors sought to stay that motion pending the reorganization proceedings in this Court.  An emergency hearing was held in Québec on March 24, 2010.  The Canadian Court denied BMO's request to liquidate the assets of the Debtor and its related entities in order to allow the reorganization to proceed in these cases in the United States.  BMO subsequently attempted to appeal this order, but the Canadian Court again denied BMO the relief it sought.

Gyro-Trac, Inc., Gyro Trac-West Coast, Inc., and the Debtor plan to make a motion to the Court to substantively consolidate all the cases.  This motion will be based upon the fact that the companies have loaned substantial sums among themselves. The companies made several intercompany transfers.  The Debtor lists its obligation to Gyro-Trac Inc. at $1.9 million and its

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 15 of  26

obligation to Gyro Trac West Coast at $8.3 million.  BMO, one of the primary secured creditors in this case, did not distinguish between the entities for purposes of making its loan.  BMO's claims against all the companies are based upon the same debt.

Substantive consolidation will not significantly impact any class of creditors for any of these debtors.  The only non-creditors of Gyro Trac, Inc. are also creditors of the Debtor.  Gyro Trac West Coast has only three, non-insider creditors which are not creditors of the Debtor.  Those claims total approximately $80,000.  The remaining creditors of Gyro-Trac, Inc. and Gyro-Trac West Coast, Inc. have identical claims against the Debtor.  In light of the substantial transfers between the companies, as shown in the Debtors' schedules, substantive consolidation will result in more equitable treatment for the unsecured creditors of all entities.   The consolidated assets which are not abandoned will be used by the reorganized Debtor.

## IV.    PROPERTY OF THE DEBTOR

Debtor's primary assets on the date of filing consist of the following:

1.    <u>Cash and Receivables</u>.  Approximately $171,000 in cash and $375,000 in receivables (less than 90-days aged).  These assets are subject to the blanket lien of the BMO.

2.    <u>New equipment.</u>  As listed on the schedules is subject to the $2.9 million floor plan lien of BB&T.  See Exhibit B.  The values listed on Exhibit B are estimates of the liquidation value of the equipment inventory.  The Debtor made these estimates upon a review of auction prices for used machines, its experience in the forestry industry, and its assessment of current market conditions.  No outside party has provided an estimate of value of these machines at auction sale.

3.    <u>Various used equipment listed in the schedules</u>.  These assets are subject to the blanket lien of the BMO.  The values listed on Exhibit B are estimates of the liquidation value of the these assets.  The Debtor made these estimates upon a review of auction prices for used machines, its experience in the forestry industry, and its assessment of current market conditions.  No outside party has provided an estimate of value of these machines at auction sale.

4.    <u>Office fixtures, equipment, furnishings</u>.  The Debtor estimates the liquidation value at $10,000.

5.    <u>Pre-petition litigation claims</u>. The Debtor has a pending claim in Charleston County

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 16 of  26

Court of Common Pleas against Commonwealth Insurance Case Number: 2009-CP-10-6392.  The

Plaintiff's demand in the Complaint seeks $617,000.  The Complaint and other pleadings are

available from the Charleston County Clerk's website:

   http://www3.charlestoncounty.org/docs/CoC/index.html

The Debtor believes it may have a claim against Vermeer Manufacturing relating to the

breach of a distribution agreement.  The Debtor's losses related to the actions of Vermeer are

significant but uncalculated at this time.  Vermeer has a claim against the Debtor for unpaid fees

under the agreement, which may be subject to set off.  Litigation of this claim has not begun, and the

Debtor is still analyzing the amount of damages, the costs of bringing the claims and several other

factors relating to the merits of the action.

The Debtor may have a claim against Desjardin relating to a breach of financing agreement.

This claim is being investigated and no damages amount has been calculated.

None of the pre-petition litigation claims are subject to a properly perfected security interest.

6.     The Debtor is in the process of reviewing its financial records with regard to whether

the Debtor has any causes of action pursuant to 11 U.S.C. §§ 547, 548, 549, and 550.  The Debtor

has identified one potential preference claim against Tuttle Dozer Works, Inc. in the amount of

$38,000.  The Debtor will continue the review of claims to determine if there are any additional

claims of this class.  These claims are not subject to any security interest.

7.     Intellectual property.  The Debtor, or its parent Gyro-Trac, Inc., and affiliate Gyro-

Trac West Coast, Inc.,  have an interest in Canadian and American patents or pending patents which

are registered in the name of Usitech Nov, Inc.  Those patents include: Track Tensioning System for

Endless Track Propelled Vehicle (United States:  No. 500.288; No. 5.515.935); Brush Cutting Head

(United States:  No. 11/431/748; No. 20070261763; Australia:  No. 2006203413;Canada:  No.

2.546.294); Brush Cutting Head with internally housed drive and bearing assembly (United States:

No.11/889.901; No. 20090044508, Canada:  No. 2597973;  Protective Guard for Cutting Tooth

Assemblies mounted on a brush cutting head (United States:  No. 12/222901; No. 20100044487;

Canada: 2,638,898).   The Debtor's interest in such patents is a subject of dispute with the

administrator of Usitech's assets in Canada, which claims that the Debtor has no interest in such

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 17 of  26

patents.  Debtor also holds a trademark registered on May 18, 2010, for "Toma-Ax."

8.    <u>Promissory note from Tremblay & Sons.</u>   This note is subject to the blanket lien of the BMO and has a current balance of $452,900.

9.    <u>Current parts inventory</u>.  At filing the Debtor maintained an inventory of parts for sale to dealers and direct sale customers.  These assets have been liquidated in the normal course of business and the funds (approximately $72,000) placed in the Debtor's DIP account.  These proceeds are subject to the lien of the BMO.

10.    <u>Miscellaneous stock.</u>   The Debtor has throughout the course of its pre-petition operation acquired machine parts which are generally used for the manufacture of the machines. Generally, these parts are not sold directly to customers but used in repair or manufacture of the machines.  Many of these parts are obsolete or unusable.  The Debtor's books list all the parts and their original cost which was $1.3 million. The Debtor has not made a physical inventory of these parts to determine their current value, but estimates that such parts have little, if any, value in liquidation because of their uniqueness to Debtor's products. These parts are subject to the blanket lien of the BMO.  The Debtor proposes to keep these parts for use in the manufacture of new equipment by the reorganized debtor.

11.    <u>Assets of Affiliates.</u>   The Debtor will move to substantively consolidate all the Gyro Trac entities.  It is not anticipated that the consolidation will have significant impact on creditors of any of the entities.  If the consolidation is approved, the assets of the consolidated Debtor will be included in the reorganized Debtor.

The primary assets of Gyro Trac, Inc. are stock (in Debtor. and Gyro-Trac West Coast, Inc.) and two patents for equipment not currently in production.  The Reorganized Debtor will retain the patents which are not believed to have any resale value.

The assets of Gyro-Trac West Coast, Inc. consist of two parcels of real property and miscellaneous equipment and parts.  If consolidation is approved, the reorganized Debtor will abandon the real property at Acheson, Alberta, but plans to retain the real property at St.-Marc Latour, Quebec, and the miscellaneous equipment and parts listed in the schedules.

## V.    SUMMARY OF PROPOSED PLAN

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 18 of  26

The Debtor will be merged with Gyro-Trac International, Gyro-Trac West Coast, Inc., and Gyro-Trac, Inc. with the surviving entity to be known simply as "Gyro Trac, Inc." Stock in the new company will be owned solely by Daniel Gaudreault, who is providing new value through the assets of Gyro-Trac International.

The Debtor's claims will be treated as follows:

<u>Class 1.</u> BB&T – Secured, impaired.

The Debtor will retain the new equipment inventory for resale. The Debtor will payoff the entire balance of the loan with interest within five years. The principal balance on each machine will be paid upon sale of each machine. The Debtor will pay interest on the outstanding balance monthly according to the non-default rate (Bank's Prime Rate plus one and one-quarter percent (1.25%) with a five and one-half percent (5.5%) minimum) as provided in the Debtor's promissory note to BB&T. The interest rate shall be the normal rate as set forth in the note, and not the default rate.

The Debtor projects that this equipment will be sold before the end of the five year payback period. However, if the payments made upon the sale of machines are not sufficient to reduce the principal balance below the balance set forth in the Liquidation Schedule (attached hereto as Exhibit A), the Debtor will make payments to reduce the principal balance as set forth in the Liquidation Schedule. Beginning six months after the Effective Date of the plan and continuing quarterly thereafter, the Debtor will make payments necessary to bring the principal balance of the loan down to the amount of the Liquidation Schedule. In the event that the principal balance is less than that set forth on the Liquidation Schedule, the Debtor will make no additional payment. Any Liquidation Payments made will be applied equally to the outstanding balances on any remaining unsold inventory.

<u>Class 2.</u> Bank of Montreal – Secured claim, impaired.

The Debtor Plan proposes to value the secured claim of the BMO pursuant to 11 U.S.C. §506(a) at Rule 3012 of Federal Rules of Bankruptcy Procedure at One Million, Two Hundred Forty-Five Thousand, Nine Hundred Dollars ($1,245,900.00).

The Debtor will pay the secured portion ("BMO Secured Debt") of the BMO's claim, One Million, Two Hundred Forty-Five Thousand, Nine Hundred Dollars ($1,245,900.00), or such amount

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 19 of  26

as is determined on hearing of the Motion to Value, in equal quarterly payments beginning six months after the Effective Date and continuing for Five Years. The Debtor will pay interest at the rate provided in the Guaranty of Gyro Trac (USA), Inc. (0.5% above BMO's prime rate of interest). The Debtor will retain all of its assets subject to the BMO lien in the amount of the BMO Secured Debt. This lien shall continue to be subordinated to the Floor Plan lien of BB&T, any future Floor Plan for the purchase of new inventory, and the liens of Caisse Popular.

Class 3. Bank of Montreal –  Unsecured claim, impaired.

The unsecured portion of BMO's debt will be treated as a general unsecured claim and included in Class 6.

Class 4. Pre-petition Employees of the Debtor – Priority unsecured, impaired.

Pre-petition claims for wages and commissions will be paid 100 percent of their allowed priority claims within 90 days of the Effective Date. Any claims in excess of the priority amount will be paid as genera unsecured claims.

Class 5. Claims of Insiders – Unsecured, impaired.

This class consists of all claimants who are insiders of the Debtor, and includes the claims of Gyro-Trac, Inc., Gyro-Trac West Coast, Inc., and  PricewaterhouseCoopers, Inc., as receiver for Usitech, and Gyro-Trac International. These claims will not be paid.

Class 6. General Unsecured Claims –  Unsecured, impaired.

The General Unsecured claims consist of all scheduled or allowed unsecured claims which are not otherwise provided for in this Plan and are in excess of $1,000. The Debtor will pay a total of $200,000 in four equal installments of $50,000 beginning one year after the Effective Date and continuing thereafter in six month intervals. General Unsecured Claims will be paid pro rata the allowed amount of their claims. If Court grants the Debtor's motion to substantively consolidate the Gyro-Trac cases, the unsecured class will also contain the unsecured claims of Gyro-Trac West Coast.

Class 7.  De Minimus Unsecured Claims – Unsecured, impaired.

The de minimus claims are all general unsecured claims in amounts less than $1,000. The Debtor estimates there are approximately 30 such claims. The de minimus claims will be paid at

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 20 of  26

rate of 75 percent of their allowed amount within 90 of the Effective Date.

Class 8.  Rejected dealer contracts –  Unsecured, impaired.

All claims arising from the rejection by the Debtor of dealership agreements.  The amount of such claims is unliquidated and unknown.  These claims will not receive any distribution under the plan.  However, the Debtor will honor warranty claims made by their customers through the dealer on machines sold to dealers pre-petition up to the amount of the replacement cost of the parts. Any unpaid, pre-petition warranty claims by dealers will receive a parts account credit valued at 90% of the total allowed warranty claim.

Class 9. Utility Claims – Unsecured, impaired.

All pre-petition Utility Claims which are not paid under the Debtor's pending motion to pay will be paid at a rate of 90 percent of their allowed amount within 90 days of the Effective Date.

Class 10.  Administrative Claims – Priority, unimpaired.

This class consists of the administrative claims of the Debtor's attorneys and other professionals, quarterly fees of the United States Trustee, and any unpaid post-petition operating expenses. Professional fees incurred through the date of confirmation will be paid only after court approval. After court approval, where necessary, these expenses will be paid in full from the estate.

Class 11. Equity – Unsecured, impaired.

No equity owner of the Debtor or the Debtor's parent or affiliate will receive any payment on account of the equity interests.

## VI.    LIQUIDATION AND OTHER ALTERNATIVES TO PLAN CONFIRMATION

There are three possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Debtor's Bankruptcy Case; (b) the Bankruptcy Court could consider an alternative plan of reorganization or orderly liquidation, or (c) the Debtor's Bankruptcy Case could be converted to a liquidation case under Chapter 7 of the Bankruptcy Code. These alternatives are described briefly below.

**Chapter 7 Liquidation**

In the event of a liquidation, the secured lenders would receive the auction value of the assets after the payment of the costs of administration for a Chapter 7 and the Trustee's fees.  The figures

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 21 of  26

used for the Debtor's liquidation analysis are as stated in the Debtor's schedules. The estimates of value are based upon the Debtor's experience in the heavy equipment industry and examination of recent auctions of used equipment.

Based upon the liquidation values as projected by the Debtor's schedules, BB&T would receive only $2.5 million, less the costs of liquidation, on its secured claim of $2.9 million. Under the plan, BB&T's entire Floor Plan debt will be paid with interest over the next three years.

In a liquidation, BMO would receive $1,245,900. This is comprised of $411,000 in receivables, $200,000 in miscellaneous parts, a Promissory Note due from Tremblay and Sons, LLC in the outstanding principal amount of $452,900; cash from post-petition sale of parts inventory in the amount of $45,000; cash in accounts at filing of $80,000; $57,000 receivable from sale of used equipment by an auction company. Under the plan of reorganization, the Debtor will pay cash to BMO in amounts necessary to pay off the secured claim with interest. Further, BMO will receive the collateral abandoned under the Plan.

The only assets available to pay unsecured creditors would be funds realized from current and estate litigation. The Plan will provide payment of $200,000 for unsecured claimants. Moreover, priority employee creditors, Utility claims and certain de minimus claims will be paid a significant percentage of their claims within 90 days of filing. These sums would not be available in a liquidation.

In addition to the sale proceeds available through the Plan, the Plan also offers the opportunity of avoiding additional administrative costs and delays that would result from a Chapter 7 liquidation. At a minimum, a Chapter 7 Trustee would retain his/her own counsel, who would ordinarily need to devote a substantial amount of time reviewing the status of Claims and getting up to speed on various matters. Such review would include a substantial amount of time duplicating tasks previously performed by other Professionals in the case, thereby increasing both the costs and the time necessary to liquidate the Estate. Also, the statutory fee paid to the Chapter 7 Trustee would further deplete the Estate.

If this case were converted to a Chapter 7 proceeding, cash distributions, if any, would be delayed for months because the Bankruptcy Court is required to establish an additional bar date for

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 22 of  26

filing proofs of Claim against the Estate. Upon conversion to Chapter 7, unsecured creditors are given additional time to file Claims and governmental authorities are provided even longer to file their additional proofs of Claim. Upon expiration of the Chapter 7 bar dates, particularly given the high number of creditors in this case, the Chapter 7 Trustee and/or his attorney would likely require considerable time to review the Claims and undertake the Claims resolution process. Thus, not only would any dividends paid to creditors suffer because Chapter 7 professional fees would be paid at the expense of these Claims, but unsecured creditors would actually have to wait months longer for any distribution. Consequently, the Debtor believes that the Plan's lower total administrative costs and the more expeditious process of remaining in a Chapter 11 combine to result in higher recovery for creditors than a Chapter 7 liquidation could ever offer.

**Dismissal**

Were the Debtor's Bankruptcy Case dismissed, the Debtor would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code. The Debtor's primary secured creditors would be expected to immediately exercise their rights as secured creditors to foreclose and seize the Debtor's assets. There would be no assets available for the distribution to unsecured creditors. All employees would lose their jobs. Customers who own Gyro Trac machines would have difficulty finding service and replacement parts. Secured creditors would only receive the liquidation value of their collateral which is estimate to be substantially less than they would receive under the Plan.

**Confirmation of an Alternative Plan**

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan. If an alternative plan were proposed, it would more than likely be substantially similar to the current Plan in that it would propose to pay secured creditors over time. Unlike the current plan, however, it would also likely contemplate the liquidation of the Debtor's few remaining Assets and the distribution of cash to creditors of descending priority, and eliminate the Debtor's business as a going concern. The Debtor believes that the Plan described herein enables the Creditors and all parties-in-interest to realize the best payout under the circumstances and any other alternative plan would not likely provide any greater return to Claimants.

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 23 of 26

## VII.    FEASIBILITY OF THE PLAN

It is provided in 11 U.S.C. §1129(a)(11) that in order for a Plan of Reorganization to be confirmed, it must be demonstrated that the Plan of Reorganization is not likely to be followed by a liquidation or the need for further reorganization of the Debtor or any successor of the Debtor under the Plan unless the liquidation or reorganization is proposed in the Plan of Reorganization. The Debtor believes the Plan is feasible based upon conservative projections of sales and expenses.

As set forth in the proposed operating budget for the reorganized Debtor, the Debtor has ample capital to make payments due under the Plan.  The Debtor has prepared projections from income and expenses of the reorganized Debtor through the fiscal year end and they are attached as Exhibit C.

The primary reasons for the Debtor's cash flow problems in the year preceding the bankruptcy were:

1.      The seizure by the BMO of sales proceeds from the sale of four new machines, in excess of $450,000 (CND).

2.      The payment of in excess of $450,000 on pre-petition product liability settlement claims.

3.      The seizure by the BMO and other creditors of Usitech, the Debtor's main supplier of parts and inventory.

4.      The associated legal and administrative costs of product liability litigation and defense of claim by BMO.

5.      The costs of preparing equipment for the Vermeer distribution deal.

All these reasons  will be eliminated or limited under the plan of reorganization.  Even with these hindrances  the Debtor was able to reduce secured lending under the Floor Plan by more than $2.5 million in the five quarters prior to the filing in this case.

The Debtor's new supply line will be the factory which is being purchased through Gyro-Trac International.  The Debtor will also obtain parts from the reorganized machine shop which was purchased from the Usitech Nov insolvency by the Labbe family.   Capital for the resumption of production will come from the sale of current inventory and sale of parts.

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd                              Page 24 of  26

The reorganized Debtor has new infusion of capital from Daniel Gaudreault and the merger with Gyro Trac International.

On April 20, 2010, the Court granted Debtor's motion to reject certain dealer agreements. The rejection of these contracts benefits Debtor by increasing volume of direct sales of parts. Through direct sales to customers Debtor realizes a significant increase in profit margin over sales it previously made to the dealers at wholesale prices.  As the former dealers' parts inventories decrease and more Gyro-Trac owners learn that they can buy parts directly from Debtor, volume of parts sales is expected to dramatically increase.   Debtor also enjoys the benefit of being able to operate on a "cash and carry" basis rather than the net-30 repayment terms built into the previously existing dealer agreements.  This benefit increases day-to-day cash flow for Debtor.

Direct contact with both existing and prospective customers generates more opportunity and leads for direct sales of equipment at retail price.  The profit margin for a direct sale of equipment at retail price is higher than a sale to a dealer.  Basically, it permits Debtor to cut out the middle-man between itself and its customer, thereby resulting in increased income for Debtor as well as the ability to directly address customer's needs and concerns without an intermediary which ultimately puts the control of Debtor's reputation in its own hands rather than in the hands of a third party who would put its own interests before those of Debtor.  Further, two of Debtor's busiest geographical markets were previously reserved exclusively for dealers, but now Debtor can market to these areas directly and receive more income from equipment sales in those territories.

The value that the Debtor retains as a going concern increases substantially the value of the collateral so that sales can be made in excess of the lien of BB&T.  The projections of future sales indicates that future sales will be in excess of those need to fund the plan.   The Debtor will assume beneficial contracts as set forth more fully in the Plan.

The reorganized Debtor will have decreased expenses. Gyro Trac has cut employees and operational costs dramatically over the past two years.  These reduced expenses will help insure the feasibility of the Plan.

## VIII. TAX CONSEQUENCES

The Debtor believes there are no adverse tax consequences to the Debtor or its creditors as

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 25 of  26

a result of the bankruptcy and the provisions of the Plan but all creditors and parties in interest should consult their respective accountants and/or tax attorneys.

## IX.    CONCLUSION

The Creditors and readers of this Disclosure Statement are directed to the Plan of Reorganization for specific treatment of their particular claims against the Debtor. The provisions of the Plan satisfy all undisputed claims against the Debtor.

**RESPECTFULLY SUBMITTED** on this the 3rd day of June, 2010, at Charleston, South Carolina.

THE CULVER FIRM, P.C.

/s/ Robert Culver
Robert E. Culver, Esq.
Fed. Id. No.: 7289
575 King Street, Ste. A
Charleston, SC 29403
Email: bob@culverlaw.net
Phone: 843-853-9816
Facsimile: 843-853-9838

Z:\Client files\Gyro Trac reorganization\Plan Disclosure Statement\Amended Disclosure
Stmt\Second amended Disclosure Statement Final\disclosure
statement.amended.consolidated.060310.11am.wpd

Page 26 of  26

## Liquidation of BB&T Principal Schedule

| Maximum Principal Balance | Date |
|---|---|
| 2,905,376 | Effective Date of Plan |
| 2,760,108 | 1Q, Six months after Effective Date |
| 2,614,839 | 2Q |
| 2,469,570 | 3Q |
| 2,324,301 | 4Q |
| 2,179,032 | Year 2, 1Q |
| 2,033,763 | 2Q |
| 1,888,495 | 3Q |
| 1,743,226 | 4Q |
| 1,597,957 | Year 3, 1Q |
| 1,452,688 | 2Q |
| 1,307,419 | 3Q |
| 1,162,151 | 4Q |
| 1,016,882 | Year 4, 1Q |
| 871,613 | 2Q |
| 726,344 | 3Q |
| 581,075 | 4Q |
| 435,806 | Year 5, 1Q |
| 290,538 | 2Q |
| 145,269 | 3Q |
| 0 | 4Q |

EXHIBIT A

## GYRO-TRAC USA, INC
## INVENTORY LIST - effective 5/25/2010

| # | Serial Number | Item Description | | Location | Liquidation Value |
|---|---|---|---|---|---|
| 1 | 500HF0904-1059 | 500H Cutterhead | | 10 Flying Cloud Drive, Summerville, SC | $8,000.00 |
| 2 | H0204-1049 | 500H Cutterhead | USED | | $8,000.00 |
| 3 | 500HF06-1207 | 500H Cutterhead | USED | | $11,850.00 |
| 4 | 500HF06-1232 | 500H Cutterhead | | 10 Flying Cloud Drive, Summerville, SC | $11,850.00 |
| 5 | 500HF-1370 | 500H Cutterhead | | | $0.00 |
| 6 | 500HF-1372 | 500H Cutterhead | | 10 Flying Cloud Drive, Summerville, SC | SOLD |
| 7 | 500HF-1374 | 500H Cutterhead | | Lamtech, Quebec, Canada | $11,850.00 |
| 8 | 500HF-1375 | 500H Cutterhead | | 10 Flying Cloud Drive, Summerville, SC | $11,850.00 |
| 9 | 500HF-1380 | 500H Cutterhead | | 10 Flying Cloud Drive, Summerville, SC | $11,850.00 |
| 10 | GT13LT10041001C | GT-13 with regular tracks | USED | Lamtech, Quebec, Canada | $22,500.00 |
| 11 | BCT13107C6C | GT13XP BRUSHCUTTER | | | SOLD |
| 12 | BCT13107C6C | GT13XP BRUSHCUTTER | | | $0.00 |
| 13 | BCT13109C | GT13XP BRUSHCUTTER | USED | 10 Flying Cloud Drive, Summerville, SC | $53,700.00 |
| 14 | BCT13108IC | GT13XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $53,700.00 |
| 15 | BCT13108SC | GT13XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $53,700.00 |
| 16 | BCT13108ZC | GT13XP BRUSHCUTTER WITH CE KIT | | 10 Flying Cloud Drive, Summerville, SC | $53,700.00 |
| 17 | GT16 BRUSHCUTTER | GT16 BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $45,000.00 |
| 18 | GT16T161001C | GT18 Brushcutter | | Ste. Justine, Quebec, Canada | $25,000.00 |
| 19 | GT2506110C6C | GT-25 BRUSHCUTTER | USED | 10 Flying Cloud Drive, Summerville, SC | $60,000.00 |
| 20 | GT251233C | GT-25XP BRUSHCUTTER | USED | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 21 | BCT251233C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 22 | BCT251238C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 23 | BCT251239C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 24 | BCT251235C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 25 | BCT251230C | GT-25XP BRUSHCUTTER | | | SOLD |
| 26 | BCT251231C | GT-25XP BRUSHCUTTER | | | SOLD |
| 27 | BCT251232C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 28 | BCT251237C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 29 | BCT251243C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 30 | BCT251241C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 31 | BCT251242C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 32 | BCT251243C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 33 | BCT251244C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 34 | BCT251245C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 35 | BCT251246C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 36 | BCT251247C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 37 | BCT251248C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 38 | BCT251249C | GT-25XP BRUSHCUTTER | | 10 Flying Cloud Drive, Summerville, SC | $107,143.00 |
| 39 | SKD-1060 | Low Flow cutterhead | | 10 Flying Cloud Drive, Summerville, SC | $5,625.00 |
| 40 | SKD-1084 | Low Flow cutterhead | | 10 Flying Cloud Drive, Summerville, SC | $5,625.00 |
| 41 | SKD-1087 | Low Flow cutterhead | | Wendell DeVries, for show and tell - Franklin, TN | $5,625.00 |
| 42 | SKD-1088 | Low Flow cutterhead | | 10 Flying Cloud Drive, Summerville, SC | $5,625.00 |
| 43 | SKD-1090 | Low Flow cutterhead | | 10 Flying Cloud Drive, Summerville, SC | $5,625.00 |
| 44 | SKD05-1002 | Low Flow cutterhead | USED | Wendell DeVries, for show and tell - Franklin, TN | $2,500.00 |
| 45 | SKD-1089 | Low Flow cutterhead | | 10 Flying Cloud Drive, Summerville, SC | $5,625.00 |
| 46 | SKD-1096 | Low Flow cutterhead | | 10 Flying Cloud Drive, Summerville, SC | SOLD |
| 47 | SKD-1096 | Low Flow cutterhead | | | $0.00 |
| 48 | SKD-1097 | Low Flow cutterhead | | 10 Flying Cloud Drive, Summerville, SC | $5,625.00 |
| 49 | SKD-1102 | Low Flow cutterhead | | 10 Flying Cloud Drive, Summerville, SC | $5,625.00 |
| 50 | SKD-1100 | Low Flow cutterhead | | 10 Flying Cloud Drive, Summerville, SC | $5,625.00 |
| 51 | SKD-1101 | Low Flow cutterhead | | 10 Flying Cloud Drive, Summerville, SC | $5,625.00 |
| 52 | | | | | |
| 53 | | | | | $2,334,581.00 |

Exhibit B

# SUMMARY OF PROJECTED CASH FLOW– FY 2010

| | |
|---|---|
| **BEGINNING BALANCE:** | $106,876 |
| **CASH IN:** | $6,419,120 |
| **CASH OUT:** | -$4,952,379 |
| **END BALANCE:** | $1,573,618 |

- For purposes of this projection, FY 2010 began 3/17/2010 and ends 11/30/2010

- Income is based on sale of existing equipment inventory without the need for production of new equipment during FY 2010. Debtor estimates that based on current projections and current equipment inventory, manufacture of new equipment would not be necessary until FY 2011.

- This projection includes figures from both the period prior to confirmation of the Plan of Reorganization and the period after confirmation of the Plan of Reorganization during this time period.

- Includes all Plan payments based on proposed Amended Disclosure Statement (6/2/2010) as well as all production, administrative, operation and other costs

EXHIBIT C

**PROJECTED INCOME STATEMENT**
FY 2010  (3/17/2010 - 11/30/2010)

| | Accounts Description | | |
|---|---|---|---|

## INCOME

| | | |
|---|---|---:|
| | Income Brushcutter - GT-60 | 0.00 $ |
| | Income Brushcutter - GT-40 | 0.00 $ |
| | Income Brushcutter - GT-25 | 3,900,000.00 $ |
| | Income Brushcutter - GT-13 | 895,000.00 $ |
| | Income Used Machines | 0.00 $ |
| | Income Baler | 625,000.00 $ |
| | Income Cutterhead - Toma-Ax 500 | 199,750.00 $ |
| | Income Skid Steer | 112,500.00 $ |
| | **Income Equipment Sales** | **5,732,250.00 $** |
| | **Income Parts Sales** | **1,040,000.00 $** |
| | Income Rental | 0.00 $ |
| | Income Transport | 0.00 $ |
| | Income Transport Return | 0.00 $ |
| | Income Service | 0.00 $ |
| | Income Training | 0.00 $ |
| | Income Grant | 0.00 $ |
| | **Other Income** | **0.00 $** |

## TOTAL INCOME

| | | |
|---|---|---:|
| | **TOTAL INCOME** | **6,772,250.00 $** |

## COST OF GOODS SOLD

| | | |
|---|---|---:|
| | Inventory, Beginning of Year - Products | 4,764,663.81 $ |
| | Inventory, Beginning of Year - Parts | 1,299,804.76 $ |
| | **Inventory, Beginning of Year** | **6,064,468.57 $** |
| | **Equipment  - Whole Goods** | **347,463.70 $** |
| | **Purchases of Parts** | **800,000.00 $** |
| | Production Wages | 40,923.15 $ |
| | Parts Wages | 60,952.00 $ |
| | Training Wages | 0.00 $ |
| | Fringe Benefits - Production | 3,478.47 $ |
| | Fringe Benefits - Parts | 5,180.92 $ |
| | Fringe Benefits - Training | 0.00 $ |
| | Bonus - Parts | 0.00 $ |
| | Workers Compensations | 14,099.00 $ |
| | **Salaries and Fringe Benefits** | **124,633.54 $** |
| | **Commission - Parts** | **0.00 $** |

**PROJECTED INCOME STATEMENT**
**FY 2010  (3/17/2010 - 11/30/2010)**

| Accounts Description | |
|---|---:|
| **Shop Sub-Contract** | **2,125.00 $** |
| Rental - Building | 70,400.00 $ |
| Rental - Supplies | 0.00 $ |
| Rental - Rolling Stock | 0.00 $ |
| **Rent** | **70,400.00 $** |
| Maintenance - Rolling stock - Service | 2,600.00 $ |
| Maintenance - Rolling stock - Training | 0.00 $ |
| Maintenance - Building | 11,200.00 $ |
| Maintenance - Rolling Stock - Parts | 1,700.00 $ |
| **Repairs and Maintenance** | **15,500.00 $** |
| **Electricity & Heat** | **10,750.00 $** |
| Uniforms | 1,156.00 $ |
| Shop Supplies - Service | 17,000.00 $ |
| Shipping Supplies | 7,225.00 $ |
| Shop Supplies - Parts | 0.00 $ |
| **Supplies** | **25,381.00 $** |
| Travel Expenses - Flight - Service | 5,300.00 $ |
| Travel Expenses - Flight - Parts | 0.00 $ |
| Travel Expenses - Flight - Training | 0.00 $ |
| Travel Expenses - Cars - Service | 0.00 $ |
| Travel Expenses - Cars - Parts | 0.00 $ |
| Travel Expenses - Cars - Training | 0.00 $ |
| Travel Expenses - Fuel - Service | 8,500.00 $ |
| Travel Expenses - Fuel - Parts | 0.00 $ |
| Travel Expenses - Fuel - Training | 0.00 $ |
| Travel Expenses - Meal - Service | 4,250.00 $ |
| Travel Expenses - Meal - Parts | 0.00 $ |
| Travel Expenses - Meal - Training | 0.00 $ |
| Travel Expenses - Hotel - Service | 10,625.00 $ |
| Travel Expenses - Hotel - Service | 0.00 $ |
| Travel Expenses - Hotel - Training | 0.00 $ |
| **Travel Parts/Service/Training** | **28,675.00 $** |
| **Amortization - Machinery & Equipment** | **9,588.42 $** |
| **Amortization - Building** | **6,467.66 $** |
| **Amortization - Deferred charges** | **0.00 $** |
| Inventory, End of Year - Products | 2,202,051.13 $ |
| Inventory, End of Year - Parts | 1,299,804.76 $ |
| **Inventory, End of Year** | **(3,501,855.89 $)** |

**PROJECTED INCOME STATEMENT**
**FY 2010  (3/17/2010 - 11/30/2010)**

| Accounts Description | |
|---|---|
| **TOTAL COST OF GOODS SOLD** | 4,003,597.00 $ |
| **GROSS PROFIT** | 2,768,653.00 $ |
| | 40.9% |

## SELLING EXPENSES

| | |
|---|---|
| Commissions - Sales | **113,750.00 $** |
| License Fee | **225,493.14 $** |
| **Commissions - Sales** | **339,243.14 $** |
| Sales Wages | 63,333.27 $ |
| Marketing Wages | 0.00 $ |
| Fringe Benefits - Sales | 15,052.08 $ |
| Fringe Benefits - Marketing | 0.00 $ |
| **Salaries and Fringe Benefits** | **78,385.35 $** |
| Advertising - Print | 0.00 $ |
| Advertising - Coop | 0.00 $ |
| Advertising - Internet | 12,000.00 $ |
| Advertising - Television | 0.00 $ |
| Trade Show Expenses | 5,000.00 $ |
| Conferences | 0.00 $ |
| Sales - Incentives | 0.00 $ |
| Promotional Supplies | 1,600.00 $ |
| Donation | 0.00 $ |
| Parts - Sales | 800.00 $ |
| **Advertising** | **19,400.00 $** |
| Maintenance - Rolling Stock - Sales | 4,400.00 $ |
| Maintenance - Rolling Stock - MKT | 0.00 $ |
| **Maintenance - Rolling Stock** | **4,400.00 $** |
| **Rental - Equipment** | **0.00 $** |
| **Transportation - Sales** | **85,000.00 $** |
| Travel Expenses - Flight - Sales | 4,250.00 $ |
| Travel Expenses - Flight - Marketing | 1,200.00 $ |
| Travel Expenses - Cars - Sales | 5,100.00 $ |
| Travel Expenses - Cars - Marketing | 400.00 $ |

**PROJECTED INCOME STATEMENT**
FY 2010  (3/17/2010 - 11/30/2010)

| Accounts Description | |
|---|---:|
| Travel Expenses - Fuel - Sales | 21,250.00 $ |
| Travel Expenses - Fuel - Marketing | 200.00 $ |
| Travel Expenses - Meals - Sales | 3,825.00 $ |
| Travel Expenses - Meals - Marketing | 400.00 $ |
| Travel Expenses - Hotel - Sales | 10,750.00 $ |
| Travel Expenses - Hotel - Marketing | 1,000.00 $ |
| **Travel  Sales/Marketing** | **48,375.00 $** |
| **Warranty Expenses** | **120,000.00 $** |
| **Amortization - Rolling Stock** | **19,906.94 $** |
| **TOTAL SELLING EXPENSES** | **714,710.43 $** |

## R&D EXPENSES

| | |
|---|---:|
| R&D Wages | 89,884.44 $ |
| Fringe Benefits - R&D | 6,876.16 $ |
| **Salaries and Fringe Benefits** | **96,760.60 $** |
| Parts - R&D | 38,000.00 $ |
| Insurance - Rolling Stock - R&D | 0.00 $ |
| Maintenance - Rolling Stock - R&D | 0.00 $ |
| Tax on Vehicules | 0.00 $ |
| **Supplies and Other Fees** | **38,000.00 $** |
| Travel Expenses - Flight - R&D | 1,600.00 $ |
| Travel Expenses - Cars - R&D | 0.00 $ |
| Travel Expenses - Fuel - R&D | 4,000.00 $ |
| Travel Expenses - Meals - R&D | 0.00 $ |
| Travel Expenses - Hotel - R&D | 0.00 $ |
| **Travel  R & D** | **5,600.00 $** |
| **TOTAL R&D EXPENSES** | **140,360.60 $** |

## ADMINISTRATIVE EXPENSES

| | |
|---|---:|
| Administrative Wages | 398,905.97 $ |
| Fringe Benefits - Administration | 33,907.01 $ |

**PROJECTED INCOME STATEMENT**
FY 2010  (3/17/2010 - 11/30/2010)

| Accounts Description | |
|---|---:|
| Bonus - Administration | 0.00 $ |
| **Salaries and Fringe Benefits** | **432,812.98 $** |
| **Bad Debts** | **0.00 $** |
| Insurance - Commercial | 73,318.00 $ |
| Insurance - Administrator | 0.00 $ |
| Health Expenses | 61,688.00 $ |
| **Insurance** | **135,006.00 $** |
| **Rental Building** | **0.00 $** |
| **Office Expenses** | **27,583.36 $** |
| **Recruting and Training Fees** | **0.00 $** |
| **Professional Fees** | **50,000.00 $** |
| **Taxes and Permits** | **3,700.00 $** |
| **Telecommunication** | **52,563.00 $** |
| Travel Expenses - Flight - Administration | 4,250.00 $ |
| Travel Expenses - Cars - Administration | 2,125.00 $ |
| Travel Expenses - Fuel - Administration | 2,550.00 $ |
| Travel Expenses - Meals - Administration | 3,800.00 $ |
| Travel Expenses - Hotel - Administration | 4,250.00 $ |
| **Travel Administration** | **16,975.00 $** |
| Insurance - Rolling Stock | 900.00 $ |
| Maintenance - Rolling Stock | 5,600.00 $ |
| Rental - Rolling Stock | 0.00 $ |
| Tax on Vehicules -admin | 350.00 $ |
| **Rolling Stock - Expenses** | **6,850.00 $** |
| **Amortization - Office Furniture** | **1,645.05 $** |
| **Amortization - Hardware** | **6,259.31 $** |

**PROJECTED INCOME STATEMENT**
FY 2010  (3/17/2010 - 11/30/2010)

| Accounts Description | |
|---|---:|
| Amortization - Software | 21,624.09 $ |
| Amortization - Leasehold Improvements | 19,861.49 $ |
| Amortization - Signs | 203.19 $ |
| Amortization - Intellectual property | 0.00 $ |

**TOTAL ADMINISTRATIVE EXPENSES** — 775,083.47 $

## FINANCIAL EXPENSES

| | |
|---|---:|
| Interest & Bank Charges | 4,500.00 $ |
| Interest & Penalties | 1,350.00 $ |
| Interest on Line of Credit - Floor Plan | 105,132.32 $ |
| ADP Fees | 5,400.00 $ |
| Exchange Differences | 0.00 $ |
| **Interest on short-term financing and bank c** | 116,382.32 $ |
| **Interest - Long Term Debt** | 10,541.36 $ |
| **Interest - Incomes** | 17,450.22 $ |

**TOTAL FINANCIAL EXPENSES** — 144,373.90 $

**INCOME BEFORE INCOME TAXES** — 994,124.61 $

Incomes Taxes — 367,826.11 $

**NET INCOME** — 626,298.51 $

**NET INCOME** — 9.2%

# SUMMARY OF PROJECTED CASH FLOW– FY 2011

| | |
|---|---|
| **BEGINNING BALANCE:** | **$1,573,618** |
| **CASH IN:** | **$12,959,512** |
| **CASH OUT:** | **-$12,731,550** |
| **END BALANCE:** | **$1,801,580** |

- Based on sales of 26 Brushcutters, 40 Cutterheads (All), & 21 Balers

- Debtor anticipates that manufacturing of new equipment would begin during FY 2011 and the cost of manufacturing is included above

- Includes all Plan payments based on proposed Amended Disclosure Statement (6/2/2010) as well as all production, administrative, operation and other costs

# SUMMARY OF PROJECTED COSTS ASSOCIATED WITH INITIATING MANUFACTURING IN FY 2011 AT SAINTE-JUSTINE, QUÉBEC (CANADA)

## PROJECTED PRODUCTION COSTS – FY 2011

| | |
|---|---|
| Cost of wages of production | $300,858.43 |
| Cost of parts for production | $5,734,906.00 |
| Cost of indirect wages[1] | $297,948.13 |
| Cost of Operations - Ste-Justine[2] | $257,824.41 |
| **Total Cost of Production** | **$6,591,536.97** |

## PROJECTED UNITS PRODUCED  - FY 2011

| | | |
|---|---|---|
| Brushcutters (GT-25XP, GT-40, GT-13XP) | = | 26 |
| Cutter heads[3] & Attachments  (Cutter heads & Baler) | = | 61 |
| **Total Units Produced** | **=** | **87** |

## PROJECTED EMPLOYEES FOR PRODUCTION – FY 2011

| | | |
|---|---|---|
| Mechanical/Welding/Technical | = | 7 |
| Administrative (Engineering/Mgmt/Clerical)[4] | = | 5 |
| **Total** | **=** | **12** |

---

[1] *Indirect wages includes those costs for engineering and management.*

[2] *Does not include cost of repayment to Caisse Populair on mortgage/note. Those amounts are included in the global budget as part of the overall long term debt.*

[3] *Includes production of cutterheads for installation on Brushcutters as well as individual cutterheads to be sold separately.*

[4] *Two of these employees are presently employed by Gyro-Trac International, Inc. and included in budget for FY 2010 after confirmation of the Plan of Reorganization.*

**PROJECTED INCOME STATEMENT**
**FY 2011**

| | Description | | |
|---|---|---|---|

## INCOME

| | | |
|---|---|---|
| | Income Brushcutter - GT-60 | 0.00 $ |
| | Income Brushcutter - GT-40 | 425,000.00 $ |
| | Income Brushcutter - GT-25 | 6,500,000.00 $ |
| | Income Brushcutter - GT-13 | 895,000.00 $ |
| | Income Used Machines | 0.00 $ |
| | Income Baler | 2,625,000.00 $ |
| | Income Cutterhead - Toma-Ax 500 | 998,750.00 $ |
| | Income Skid Steer | 281,250.00 $ |
| | **Income Equipment Sales** | **11,725,000.00 $** |
| | **Income Parts Sales** | **1,560,000.00 $** |
| | Income Rental | 0.00 $ |
| | Income Transport | 0.00 $ |
| | Income Transport Return | 0.00 $ |
| | Income Service | 0.00 $ |
| | Income Training | 0.00 $ |
| | Income Grant | 0.00 $ |
| | **Other Income** | **0.00 $** |
| | **Income Deductions** | **0.00 $** |

## TOTAL INCOME

| | **13,285,000.00 $** |
|---|---|

## COST OF GOODS SOLD

| | | |
|---|---|---|
| | Inventory, Beginning of Year - Products | 2,202,050.76 $ |
| | Inventory, Beginning of Year - Parts | 1,302,671.03 $ |
| | **Inventory, Beginning of Year** | **3,504,721.79 $** |
| | **Equipment - Whole Goods** | **6,549,006.07 $** |
| | **Purchases of Parts** | **1,200,000.00 $** |

PROJECTED INCOME STATEMENT
FY 2011

| Description | |
| --- | --- |
| Production Wages | 56,000.10 $ |
| Parts Wages | 83,408.00 $ |
| Fringe Benefits - Production | 4,760.01 $ |
| Fringe Benefits - Parts | 7,089.68 $ |
| Bonus - Parts | 0.00 $ |
| Workers Compensations | 14,099.00 $ |
| **Salaries and Fringe Benefits** | **165,356.79 $** |
| **Commission - Parts** | **0.00 $** |
| **Shop Sub-Contract** | **3,000.00 $** |
| Rental - Building | 105,600.00 $ |
| Rental - Supplies | 0.00 $ |
| Rental - Rolling Stock | 0.00 $ |
| **Rent** | **105,600.00 $** |
| Maintenance - Rolling stock - Service | 3,900.00 $ |
| Maintenance - Building | 16,800.00 $ |
| Maintenance - Rolling Stock - Parts | 2,400.00 $ |
| **Repairs and Maintenance** | **23,100.00 $** |
| **Electricity & Heat** | **15,000.00 $** |
| Uniforms | 1,632.00 $ |
| Shop Supplies - Service | 24,000.00 $ |
| Shipping Supplies | 10,200.00 $ |
| **Supplies** | **35,832.00 $** |
| Travel Expenses - Flight - Service | 7,500.00 $ |
| Travel Expenses - Flight - Parts | 0.00 $ |
| Travel Expenses - Flight - Training | 0.00 $ |
| Travel Expenses - Cars - Service | 0.00 $ |
| Travel Expenses - Cars - Parts | 0.00 $ |
| Travel Expenses - Cars - Training | 0.00 $ |
| Travel Expenses - Fuel - Service | 12,000.00 $ |
| Travel Expenses - Fuel - Parts | 0.00 $ |
| Travel Expenses - Fuel - Training | 0.00 $ |
| Travel Expenses - Meal - Service | 6,000.00 $ |
| Travel Expenses - Meal - Parts | 0.00 $ |
| Travel Expenses - Meal - Training | 0.00 $ |
| Travel Expenses - Hotel - Service | 15,000.00 $ |
| Travel Expenses - Hotel - Service | 0.00 $ |
| Travel Expenses - Hotel - Training | 0.00 $ |
| **Travel - Parts/Service/Training** | **40,500.00 $** |
| **Amortization - Machinery & Equipment** | **25,753.03 $** |

**PROJECTED INCOME STATEMENT**
**FY 2011**

| Description | |
| --- | --- |
| **Amortization - Building** | 48,563.67 $ |
| **Amortization - Deferred charges** | 0.00 $ |
| Inventory, End of Year - Products | 2,202,053.56 $ |
| Inventory, End of Year - Parts | 1,302,671.03 $ |
| **Inventory, End of Year** | (3,504,724.59 $) |

| | |
| --- | --- |
| **TOTAL COST OF GOODS SOLD** | 8,211,708.77 $ |

| | |
| --- | --- |
| **GROSS PROFIT** | 5,073,291.23 $ |
| | 38.2% |

## SELLING EXPENSES

| | |
| --- | --- |
| Commissions - Sales | 166,965.00 $ |
| License Fees | 300,493.14 $ |
| **Commissions - Sales** | 467,458.14 $ |
| Sales Wages | 86,666.58 $ |
| Marketing Wages | 0.00 $ |
| Fringe Benefits - Sales | 21,558.68 $ |
| Fringe Benefits - Marketing | 0.00 $ |
| **Salaries and Fringe Benefits** | 108,225.26 $ |
| Advertising - Print | 0.00 $ |
| Advertising - Coop | 0.00 $ |
| Advertising - Internet | 18,000.00 $ |
| Advertising - Television | 0.00 $ |
| Trade Show Expenses | 5,000.00 $ |
| Conferences | 0.00 $ |
| Sales - Incentives | 0.00 $ |
| Promotional Supplies | 2,400.00 $ |
| Parts - Sales | 1,200.00 $ |
| **Advertising** | 26,600.00 $ |
| Maintenance - Rolling Stock - Sales | 6,600.00 $ |
| Maintenance - Rolling Stock - MKT | 0.00 $ |
| **Maintenance - Rolling Stock** | 6,600.00 $ |

**PROJECTED INCOME STATEMENT**
**FY 2011**

| | Description | | |
|---|---|---|---|
| | Rental - Equipment | | 0.00 $ |
| | Transportation - Sales | | 120,000.00 $ |
| | Travel Expenses - Flight - Sales | | 6,000.00 $ |
| | Travel Expenses - Flight - Marketing | | 1,200.00 $ |
| | Travel Expenses - Cars - Sales | | 7,200.00 $ |
| | Travel Expenses - Cars - Marketing | | 400.00 $ |
| | Travel Expenses - Fuel - Sales | | 30,000.00 $ |
| | Travel Expenses - Fuel - Marketing | | 200.00 $ |
| | Travel Expenses - Meals - Sales | | 5,400.00 $ |
| | Travel Expenses - Meals - Marketing | | 400.00 $ |
| | Travel Expenses - Hotel - Sales | | 15,000.00 $ |
| | Travel Expenses - Hotel - Marketing | | 1,000.00 $ |
| | Travel Sales/Martketing | | 66,800.00 $ |
| | Warranty Expenses | | 180,000.00 $ |
| | Amortization - Rolling Stock | | 14,691.15 $ |
| **TOTAL SELLING EXPENSES** | | | 990,374.55 $ |

**PROJECTED INCOME STATEMENT**
**FY 2011**

| | Description | | |
|---|---|---|---|

## R&D EXPENSES

| | | |
|---|---|---|
| R&D Wages | | 0.00 $ |
| Fringe Benefits - R&D | | 0.00 $ |
| **Salaries and Fringe Benefits** | | **0.00 $** |
| | | |
| Parts - R&D | | 60,000.00 $ |
| Insurance - Rolling Stock - R&D | | 0.00 $ |
| Maintenance - Rolling Stock - R&D | | 0.00 $ |
| Tax on Vehicules | | 0.00 $ |
| **Supplies and Other Fees** | | **60,000.00 $** |
| | | |
| Travel Expenses - Flight - R&D | | 3,200.00 $ |
| Travel Expenses - Cars - R&D | | 0.00 $ |
| Travel Expenses - Fuel - R&D | | 6,000.00 $ |
| Travel Expenses - Meals - R&D | | 0.00 $ |
| Travel Expenses - Hotel - R&D | | 0.00 $ |
| **Travel R&D** | | **9,200.00 $** |

### TOTAL R&D EXPENSES

| | | |
|---|---|---|
| | | **69,200.00 $** |

## ADMINISTRATIVE EXPENSES

| | | |
|---|---|---|
| Administrative Wages | | 549,465.90 $ |
| Fringe Benefits - Administration | | 46,704.60 $ |
| Bonus - Administration | | 0.00 $ |
| | | |
| **Salaries and Fringe Benefits** | | **596,170.50 $** |
| | | |
| **Bad Debts** | | **0.00 $** |
| | | |
| Insurance - Commercial | | 104,740.00 $ |
| Insurance - Administrator | | 0.00 $ |
| Health Expenses | | 92,532.00 $ |
| | | |
| **Insurance** | | **197,272.00 $** |
| **Rental Building** | | **0.00 $** |
| **Office Expenses** | | **41,000.04 $** |
| | | |
| **Recruting and Training Fees** | | **0.00 $** |

**PROJECTED INCOME STATEMENT**
**FY 2011**

| Description | |
|---|---:|
| **Professional Fees** | 50,000.00 $ |
| **Taxes and Permits** | 6,200.00 $ |
| **Telecommunication** | 73,284.00 $ |
| Travel Expenses - Flight - Administration | 6,000.00 $ |
| Travel Expenses - Cars - Administration | 3,000.00 $ |
| Travel Expenses - Fuel - Administration | 3,600.00 $ |
| Travel Expenses - Meals - Administration | 5,400.00 $ |
| Travel Expenses - Hotel - Administration | 6,000.00 $ |
| **Travel Administration** | 24,000.00 $ |
| Insurance - Rolling Stock | 900.00 $ |
| Maintenance - Rolling Stock | 8,400.00 $ |
| Rental - Rolling Stock | 0.00 $ |
| Tax on Vehicules -admin | 350.00 $ |
| **Rolling Stock - Expenses** | 9,650.00 $ |
| **Amortization - Office Furniture** | 2,554.33 $ |
| **Amortization - Hardware** | 7,304.50 $ |
| **Amortization - Software** | 25,240.12 $ |
| **Amortization - Leasehold Improvements** | 14,417.78 $ |
| **Amortization - Signs** | 315.50 $ |
| **Amortization - Intellectual property** | 0.00 $ |

**TOTAL ADMINISTRATIVE EXPENSES**     1,047,408.78 $

**PROJECTED INCOME STATEMENT**
**FY 2011**

| | Description | | |
|---|---|---|---|

## FINANCIAL EXPENSES

| | | |
|---|---|---:|
| | Interest & Bank Charges | 6,000.00 $ |
| | Interest & Penalties | 1,800.00 $ |
| | Interest on Line of Credit - Floor Plan | 155,341.42 $ |
| | ADP Fees | 7,200.00 $ |
| | Exchange Differences | 0.00 $ |
| | **Interest on short-term financing and bank charges** | **170,341.42 $** |
| | **Interest - Long Term Debt** | **25,037.36 $** |
| | **Interest - Incomes** | **23,360.56 $** |

## TOTAL FINANCIAL EXPENSES — 218,739.34 $

## INCOME BEFORE INCOME TAXES — 2,747,568.57 $

| **Incomes Taxes** | 1,016,600.37 $ |
|---|---:|

## NET INCOME — 1,730,968.20 $

## NET INCOME — 13.0%