## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF SOUTH CAROLINA

IN RE:

Gyro-Trac (USA), Inc.,

                                        Debtor.

C/A No. 10-01908-DD

Chapter 11

**ORDER**

This matter is before the Court for (1) a confirmation hearing on Gyro-Trac (USA), Inc.'s ("Debtor") Amended Plan filed on June 4, 2010, with modifications on September 30, 2010, October 7, 2010, and October 29, 2010,[1] ("Plan") (2) Motions to Consolidate Debtor's case with the associated cases of Gyro-Trac West Coast, Inc. ("West Coast") and Gyro-Trac, Inc. ("GT Inc.") filed June 21 and June 22, 2010, (3) Motion to Prohibit Continued Use of Cash Collateral filed by Bank of Montreal ("BMO") on October 11, 2010, (4) Motion to Extend Cash Collateral Order filed by Debtor on November 22, 2010, and (5) Motions for Relief from Stay with respect to Debtor and West Coast, filed by BMO on November 2, 2010 and May 19, 2010, respectively. A hearing was held on these matters December 1 through December 3, 2010. Pursuant to Fed. R. Civ. P. 52, made applicable to this proceeding by Fed. R. Bankr. P. 7052 and 9014, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. Debtor filed for chapter 11 relief on March 17, 2010. West Coast and GT Inc. also filed their chapter 11 voluntary petitions the same day.

2. Debtor, West Coast, and GT Inc. were formed by Daniel Gaudreault, who remains the president and CEO of these companies. Mr. Gaudreault also formed Gyro-Trac International,

---

[1] The Plan presented for confirmation was the June 4, 2010 Amended Plan, together with the September 30, 2010 and October 7, 2010 revisions and certain provisions of the October 29, 2010 modification, including provisions providing clarification of the procedure for the merger of the Gyro-Trac entities and the addition of a new class of creditors consisting of all claims secured by non-inventory vehicles.

Inc. ("International") in 2009. These companies will be collectively referred to as "the Gyro-Trac entities".

3.  In some form, the Gyro-Trac entities have been in existence for over twenty years. The Gyro-Trac entities began as a land clearing business. In about 1995, Mr. Gaudreault developed new timber mulching technology, which he used to design new timber mulching equipment. The equipment was sold by the Gyro-Trac entities. In 1998, Debtor was formed in South Carolina to sell the equipment.

4.  The technology developed by Mr. Gaudreault and utilized by the Gyro-Trac entities is patented. The patent is currently held by Denis CIMAF and was originally licensed to GT Inc. In a December 2008 settlement, Denis CIMAF granted GT Inc. a license for exclusive use of the technology. This agreement requires GT Inc. to pay an annual license fee by December 1st of each year, and requires that Mr. Gaudreault have a controlling ownership interest in any company using the license. In October 2009, the license was transferred from GT Inc. to International.

5.  The Gyro-Trac entities engaged Usitech Nov, Inc. ("Usitech"), a Canadian company owned by the Labbe family and Mr. Gaudreault, to manufacture its equipment. Usitech manufactured the Gyro-Trac entities' equipment from 2005 until December 2009, when Usitech entered bankruptcy in Canada and was liquidated. During Usitech's liquidation, International purchased the manufacturing equipment necessary to produce Gyro-Trac products.

6.  Debtor currently sells several pieces of forestry equipment, including two main products, GT-13s and GT-25s. These products are heavy-duty mulching machines set on track systems and containing mulching attachments on the front. These machines allow for cleaner, cheaper, and more efficient land clearing, as they mulch trees and brush into wood chips. The machines

come in varying sizes and power levels.  Debtor sells attachments and parts for these machines as well.  The Gyro-Trac entities are also in the process of developing a new type of baler which Debtor anticipates adding to its product line.

7.  At its peak, Debtor was able to sell about one hundred machines a year, plus parts and accessories.

8.  In October 2006, West Coast obtained a loan from BMO.  Both Debtor and GT Inc. guarantied this loan.  The current balance of this loan is over four million dollars and is secured by all of Debtor's personal property of any nature.  BMO's lien on Debtor's property is subordinated only to the lien on inventory held by Branch Bank & Trust Company ("BB&T").

9.  In March 2007, Debtor entered into a floor plan financing agreement with BB&T.  Under this agreement, BB&T agreed to provide financing up to $3.5 million and received a security interest in all of Debtor's new inventory.  BB&T's lien on inventory has first priority over all other lenders.

10. Beginning in 2005 and continuing through late 2009, Debtor negotiated with several heavy equipment dealers, including several individual Vermeer Manufacturing ("Vermeer") dealers, to create exclusive dealer agreements granting the dealers exclusive right to promote, sell, and service Gyro-Trac products.   In this chapter 11 case Debtor has rejected twelve (12) dealer contracts through a Motion to Reject Executory Contracts filed on March 23, 2010, and an Order granting Debtor's Motion entered April 21, 2010.

11. In late 2007, Vermeer approached Debtor to enter into a distribution agreement, which Debtor believed would allow its products to be sold world-wide.  During negotiations, in anticipation of the larger market presence and increased sales Debtor expected to receive as a result of the distribution agreement, Debtor began to build up inventory of its products.  To date,

Debtor has been unable to sell this excess inventory and is currently holding it at its Summerville, South Carolina location.

12. In late 2009, Vermeer contacted Debtor to request a modification of the parties' distribution agreement.  Due to Debtor's refusal to modify the terms of the agreement, the distribution agreement was terminated.

13. While negotiating with Vermeer, Debtor realized a need to obtain additional financing and sought to obtain an additional loan from BMO in October 2009.  After BMO discovered that Debtor's agreement with Vermeer had fallen through, BMO requested as a condition of the loan that Mr. Gaudreault personally contribute additional capital to Debtor.  Mr. Gaudreault refused to do so, and BMO refused to make the loan.

14. Debtor's financial condition continued to deteriorate until Debtor's bankruptcy filing in March 2010.

15. Debtor's Schedules reflect over eight million dollars in secured claims and approximately $10.2 million in unsecured claims.

16. Mr. Chappell Jones, an appraiser of construction parts and equipment, testified that Debtor's equipment inventory would likely sell in a liquidation for 40 percent of the list price. He also stated that if all the equipment was offered for sale at the same time, the price at which the equipment could be sold would probably be an additional 20 to 30 percent lower.  As to Debtor's parts inventory, Mr. Jones indicated that in a liquidation the parts would likely sell at the current scrap price, which is 7 to 8 cents on the dollar of the book value of the inventory.

17. Debtor's Plan provides that the Gyro-Trac entities will be merged into a single entity known as Gyro-Trac, Inc.  Mr. Gaudreault will own 100 percent of the stock in the new entity. Debtor will also use the manufacturing equipment purchased in the Usitech liquidation to begin

manufacturing its own equipment, which it will then market and sell.  Debtor also proposes a change to a "cash and carry" model, in which Debtor will require customers to pay cash for purchases whenever possible.

18. Class 1 in Debtor's Plan is the secured claim of floor plan financer BB&T.  Debtor's Plan proposes to retain BB&T's collateral to sell in the ordinary course of business.  Upon the sale of each machine subject to BB&T's lien, Debtor will pay BB&T the principal balance on the machine, plus monthly interest at the non-default contract rate.  The timeline for the pay-off of BB&T's lien is provided in a Liquidation Schedule set forth in Debtor's September 30 modification.  Three months after the effective date of Debtor's Plan, Debtor will begin making any payments necessary for the principal balance of the loan to conform to the Liquidation Schedule.  Debtor's Plan provides that BB&T will be paid in full in three years.  BB&T favors confirmation of Debtor's Plan.

19.  Debtor's Plan proposes to pay BMO's claim in full over six years.  BMO will receive a $250,000 payment plus an assignment, within 30 days of the Plan's effective date, of a promissory note from Tremblay & Sons currently owned by Debtor and worth about $450,000.[2] BMO will also receive a percentage of the proceeds of any equipment sold by Debtor during the first three years of the plan.  Three years after the effective date, the balance then owed to BMO will be paid in quarterly installments over a three year period.  Interest will be paid at 0.5% above BMO's prime rate.

20. With the exception of Class 2, BMO's secured claim, all classes voted in favor of Debtor's Plan, including all classes of insiders and two impaired classes of unsecured claims.

21. Mr. Steven Quirion, accountant for the Gyro-Trac entities, prepared financial projections for the reorganized debtor showing its anticipated financial performance.  These financial

---

[2] Tremblay & Sons is currently controlled by Mr. Gaudreault's wife.

projections presented several alternative scenarios based on differing levels of sales and showed that even with sales as low as five GT-25s a year, Debtor would have positive cash flow of $275,605 at the end of 2011.

22. Mr. Perry Woodside, Debtor's expert, evaluated the financial projections prepared by Mr. Quirion.  Mr. Woodside indicated at the confirmation hearing that based on his analysis, he believed Mr. Quirion's projections and the assumptions contained therein were reasonable and that even with very low levels of sales, Debtor would have cash flow sufficient to meet all plan payments.  Mr. Woodside also presented his own report on Debtor's Plan, which contained cash flow projections after plan payments for 2011 through 2016.  Mr. Woodside's report indicated that Debtor would have positive cash flow each year after making its plan payments.  In 2011, Debtor would have $206,252 of ending cash flow, and except for 2012, when operating cash flow after debt service is $174,239, Debtor's cash flow gradually increases each year.  In 2016, under Mr. Woodside's projections, Debtor will have $1,816,758.00 in ending cash flow.  Debtor anticipates reinvesting this ending cash flow into the business each year.

23. Mr. William McAfee, BMO's financial expert, evaluated Debtor's financial health and the potential success of Debtor's Plan.  Mr. McAfee used Debtor's historical financial data to test multiple scenarios in Debtor's future.  Under the majority of these scenarios based on Debtor's historical performance, Debtor would not succeed in the future.  However, Mr. McAfee stated that if the assumptions in Debtor's projections were correct, Debtor's Plan would be successful.  Additionally, Mr. McAfee indicated if Debtor performed at the same level as its best historical performance, Debtor's Plan would be successful.

## CONCLUSIONS OF LAW

### I.  Confirmation of Debtor's Plan

Section 1129 of the Bankruptcy Code[3] sets forth numerous requirements that must be met before the court can confirm a debtor's chapter 11 plan.  Section 1129 states that if the requirements are met, the court "shall" confirm the plan; as a result, if all section 1129 requirements are met, a court has no discretion with regard to chapter 11 plan confirmation.  The Court is required to undertake an independent evaluation of the debtor's plan to determine if it complies with section 1129 even in the absence of an objection by a creditor.  *In re Landscaping Servs., Inc.*, 39 B.R. 588, 590 (Bankr. E.D.N.C. 1984); *In re Econ. Cast Stone Co.*, 16 B.R. 647, 650 (Bankr. E.D. Va. 1981).  The debtor bears the burden of showing that the plan meets the criteria set forth in section 1129, and debtor must satisfy this burden by a preponderance of the evidence.  *In re Byrd Foods, Inc.*, 253 B.R. 196, 199 (Bankr. E.D. Va. 2000) (citing *In re DeLuca*, No. 95-11924-AM, 1996 WL 910908 (Bankr. E.D. Va. Apr. 12, 1996)).

BMO filed an Objection to Confirmation of Debtor's Plan on October 3, 2010, claiming numerous problems with Debtor's Plan.  Some of BMO's objections have been cured by provisions set forth in Debtor's third modification on October 7, 2010.  For the reasons set forth below, the Court overrules BMO's other objections to confirmation of Debtor's plan.

### a.  Section 1122(a) and section 1123(a)(4)

BMO objects to Debtor's Plan based on section 1122(a) and on several provisions of section 1123(a), including section 1123(a)(4). BMO's objection based on section 1122(a) and 1123(a)(4) states that the Plan improperly treats the unsecured portion, if any, of its claim, because it is treated differently from other general unsecured claims and therefore, the Plan

---

[3] The Bankruptcy Code is set forth in Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*  Further reference to the Bankruptcy Code will be by section number only.

violates the requirement that substantially similar claims be treated in the same manner.  This

issue is no longer present in Debtor's Plan, as the October 7 modification treats BMO's entire

claim as secured and provides that any residual unsecured claim will be treated along with all

other general unsecured claims.  Thus, any objections BMO previously had with respect to the

separate treatment of its unsecured claim are now moot.

### b.   Section 1123(a)(5)

BMO objects to confirmation of Debtor's Plan based on section 1123(a)(5).  BMO asserts

that Debtor does not have the capital to implement its Plan or to successfully reorganize.  Section

1123(a)(5) states, in relevant part, "Notwithstanding any otherwise applicable non-bankruptcy

law, a plan shall -- . . . provide adequate means for the plan's implementation."  Several means

of plan implementation are listed in section 1123(a)(5)(A-J), including retention by the debtor of

property of the estate, merger or consolidation of the debtor with other entities, sale of property

of the estate, and satisfaction or modification of liens.

Debtor incorporates each of these steps in the implementation section of its Plan.  Debtor

is retaining a substantial amount of its property, including real estate, inventory, and

manufacturing equipment, all of which it proposes to use to help it successfully reorganize.  As

part of its reorganization, the Gyro-Trac entities will merge into a single entity which will utilize

all of the Gyro-Trac entities' previously separate resources.  During its bankruptcy, Debtor has

sold some of its assets and will continue to do so following confirmation.  Finally, Debtor's Plan

provides for the satisfaction of both BB&T's and BMO's liens.   Testimony at Debtor's

confirmation hearing from Debtor's expert, Mr. Woodside, suggests that Debtor's Plan is

feasible, given certain financial assumptions.  BMO's expert, Mr. McAfee, also conceded that

under certain circumstances, Debtor's Plan could be successful.  Mr. Gaudreault testified that he

has access to sources of capital, which he has been using to fund, through International, the Gyro-Trac entities.  For example, Mr. Gaudreault testified that he had arranged for the funds from these sources to pay the December 1, 2010 license fee to Denis CIMAF.  When the Gyro-Trac entities are merged and a single, reorganized entity is created, that reorganized debtor will have access to these sources of capital, as well as International's other valuable assets, including the manufacturing equipment it purchased in Usitech's liquidation.   There is sufficient information for the Court to find that Debtor's Plan meets the requirements of section 1123(a)(5).

### c.  Section 1123(a)(7)

Section 1123(a)(7) provides, "Notwithstanding any otherwise applicable non-bankruptcy law, a plan shall -- . . . contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." BMO asserts that the proposed retention of Mr. Gaudreault and the hiring of two new officers, Steve Quirion and Jennifer Queen, violate this provision.  This is not supported by the evidence. Mr. Gaudreault was the founder of the Gyro-Trac entities and has a plan for restructuring the company.  Mr. Gaudreault has developed technology to create equipment for the Gyro-Trac entities to sell and has contributed a substantial amount of personal and family funds to the Gyro-Trac entities in order to keep them operating, including payment of the 2009 annual license renewal fee through International. Additionally and significantly, without Mr. Gaudreault having a controlling interest in the reorganized debtor, it will be unable to use the license to produce its equipment, as Mr. Gaudreault's controlling ownership of the company using the license is a

requirement of GT Inc.'s agreement with Denis CIMAF.    For these reasons, it would not be in the best interest of the reorganized debtor to exclude Mr. Gaudreault as president.

With respect to Mr. Quirion and Ms. Queen, these parties have been with the Gyro-Trac entities for a significant amount of time and are familiar with the entities' circumstances and plan of reorganization.    These individuals are well-suited to guide Debtor through its reorganization due to their familiarity with the Gyro-Trac entities.    The Court finds that the retention of Mr. Gaudreault and the hiring of Mr. Quirion and Ms. Queen does not violate section 1123(a)(7).

### d.    Good Faith

One of BMO's principal arguments is that Debtor's Plan is not proposed in good faith. Section 1129(a)(3) requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."    BMO argues that Debtor's Plan was not proposed in good faith for a variety of reasons, including its treatment of BMO's secured and unsecured claims, its artificial impairment of certain creditors, and its new management structure and capitalization.    In determining whether a chapter 11 plan has been proposed in good faith, the court must consider the totality of the debtor's circumstances.    *In re Radco Props., Inc.*, 402 B.R. 666, 673 (Bankr. E.D.N.C. 2009) (citing *In re Piece Goods Shops Co./Piece Goods Shop Corp.*, 188 B.R. 778, 790 (Bankr. M.D.N.C. 1995)).    Because the purpose of chapter 11 is to restructure the debtor's obligations and allow its business to continue, "a plan is [generally] proposed in good faith if there is a reasonable likelihood that it will achieve a result consistent with the goals of the Bankruptcy Code." *Piece Goods Shops Co.,* 188 B.R. at 790 (citations omitted); *In re Walker*, 165 B.R. 994, 1001 (E.D. Va. 1994) (quoting *Hanson v. First Bank of S.D., N.A.,* 828 F.2d 1310, 1315 (8th Cir. 1987)).

In Debtor's case, the totality of the circumstances indicates that the Plan was proposed in good faith. Debtor's Plan proposes to pay BB&T's and BMO's claims in full, and proposes to pay unsecured creditors a much higher amount than they would receive in a chapter 7 liquidation. Debtor has attempted to negotiate with its secured creditors and has amended its Plan several times in an attempt to respond to creditors' objections, thus satisfying the objections of BB&T. Debtor has taken several steps to lower its costs and increase its efficiency, including reducing its workforce and merging the Gyro-Trac entities into a single company. Debtor has received little opposition to its plan from its creditors; with the exception of BMO, nearly all creditors voted in favor of Debtor's Plan.

International also purchased manufacturing equipment in the Usitech liquidation. This equipment will be retained in the reorganization and will be owned by the reorganized debtor, who will use it to manufacture its own products. BMO asserts that Debtor should not be permitted to reorganize by starting a new business, which is the way BMO characterizes Debtor's effort to add a manufacturing component to its existing business. Manufacturing its products in-house will allow Debtor to have direct control over the efficiency and cost of the manufacturing process that appears to have previously been largely beyond Debtor's control. The Court does note that the manufacturing was previously done by Usitech and Mr. Gaudreault was an equity holder in that business as well; as a result, at least some element of control was likely present. However, through engaging in manufacturing directly, Debtor will be able to further reduce its costs by monitoring its manufacturing process and will be able to better control its inventory. The purchase of manufacturing equipment from Usitech and the attempt to bring the manufacturing component in-house is another indication of Debtor's good faith intention to reorganize.

BMO originally objected that the grant of 100% ownership of the reorganized debtor to Mr. Gaudreault violates the absolute priority rule under section 1129(b)(2)(B), because the "new value" he is contributing, including the intellectual property license, manufacturing equipment purchased from Usitech, and his personal capital contributions, is illusory.  The absolute priority rule is no longer at issue with respect to BMO's claim. At the time of BMO's Objection, BMO's unsecured claim was placed in Class 3 by itself.  However, the October 7 modification to Debtor's Plan eliminates Class 3, treating any amount of BMO's claim that is unsecured with other general unsecured claims.  As a result, BMO's objection based on the Plan's violation of the absolute priority rule is no longer relevant, and because no other unsecured creditors have dissented, the absolute priority rule is not at issue at all in Debtor's case. Notwithstanding this change, BMO cites Mr. Gaudreault's allegedly "illusory" contribution as an indicator of Debtor's bad faith in proposing its plan.

Mr. Gaudreault's contributions to the new venture and his ownership intent do not support a finding of bad faith. Mr. Gaudreault is contributing the resources and capital owned and acquired by International, a separate entity created and maintained by him, to the reorganized debtor.  This contribution includes the license, new manufacturing equipment purchased from Usitech, and sources of capital Mr. Gaudreault testified that International has access to, as well as Mr. Gaudreault's personal financial contributions.  BMO complains that the license was fraudulently transferred by Debtor to International and that Debtor's Plan simply returns the asset to the original owner.  The issue of fraudulent transfer is not presently before the Court; therefore, the Court will not assess the merits of BMO's assertion, other than to note that International paid the most recent license renewal fee to Denis CIMAF.  If International had not done so, the license would have been lost.  Even in the absence of the contribution of the license

12

to the reorganized debtor, Mr. Gaudreault has made sufficient other contributions for a finding that his contributions do not indicate bad faith.

BMO's final argument with respect to good faith is in regards to the treatment of its secured claim. BMO asserts that the Plan shifts the entire risk of loss to it because it is the only creditor that will not be completely paid by the end of the third year of the plan. BMO submits this is in violation of the Code and is evidence of bad faith.

The Court finds that the treatment of BMO's secured claim is fair and equitable. BMO will be paid in full over the life of the Plan, receiving a total of approximately $4.2 million over six years. Any time Debtor sells a machine, BMO will be paid any amount of net proceeds left after BB&T's lien is paid, and BMO will also receive 50 percent of net proceeds from the sale of any used machines. After three years, BMO will receive, over a three year period, quarterly payments in an amount necessary to pay the remaining amount of its claim. BMO is also being paid interest on its claim at a rate 0.5 percent over BMO's prime rate.

Under Debtor's Plan, all creditors will bear part of the risk of loss. While BMO will not be paid as quickly as some other creditors, for the first three years of Debtor's Plan, BMO will receive some funds every time Debtor sells a machine, subject only to deduction of the amount owed BB&T, the floor plan financer. After BB&T is paid off, BMO will have first priority over all other creditors, some of which are receiving less than the full amount of their claims. Additionally, at over four million dollars, BMO's claim is much larger than any other creditor's; as a result, it is not surprising that BMO's claim will take longer to pay.

Debtor's Plan does state that BMO can be subordinated to any future floor plan lenders. However, Debtor's counsel stated at the hearing that this provision is immaterial because Debtor does not anticipate seeking any new funding and in addition, Debtor would be willing to remove

this provision from its Plan.  Since this reservation of the right to seek future floor plan lending is a contested provision and because it has no parameters, the plan confirmed by the Court does not provide for future floor plan lending absent the acquiescence of BMO.

Three years after the Plan's effective date, BMO will be the only remaining creditor of Debtor, with the exception of any new claims.  Assuming Debtor's reorganization is in fact successful, Debtor will be well-settled in its new business model and should be operating efficiently and profitably.  Debtor's financial projections support this.  BMO will not be subordinated to any other creditors; as a result, BMO will be the first to get paid.  Based on these considerations, the Court finds that the treatment of BMO's claim in Debtor's Plan is not an indicator of bad faith.  The Court finds that the totality of the circumstances indicates that Debtor's Plan is proposed in good faith.

### e.   Section 1129(a)(5)(A)(ii) and (b)

Section 1129(a)(5) sets forth the requirements for disclosing and retaining employees under a plan of reorganization.  In its Objection, BMO states that Debtor has violated these provisions because it has failed to disclose the amount of compensation the insiders hired by the reorganized debtor will receive.  BMO also alleges that the hiring of these insiders is not "consistent with the interests of creditors and equity security holders and with public policy," as required by section 1129(a)(5)(A)(ii).

At the confirmation hearing, Debtor's counsel stated that this objection had been cured because Debtor had provided BMO with the needed information.  BMO did not pursue its objection on this ground; therefore, the Court finds that Debtor has provided BMO with the information required by the Code.  The Court discussed earlier in this Order the employment of Mr. Gaudreault, Mr. Quirion, and Ms. Queen, three of the proposed employees of the

reorganized debtor.  As stated above, the Court finds that the hiring of these insiders is in the interests of creditors, equity security holders, and does not violate public policy.

### f.   Section 1129(a)(7)

Section 1129(a)(7)(A) requires that if a creditor does not accept the debtor's plan, that creditor must receive under the terms of the plan at least the amount it would receive in a liquidation under chapter 7.  Because BMO voted against Debtor's Plan, BMO must receive through Debtor's Plan at least the amount it would if Debtor were liquidated under chapter 7.

Debtor presented testimony that through its Plan, all creditors will receive more than they would in chapter 7, and that BMO's claim would be paid in full, with interest, over the life of the Plan.  Testimony presented by Debtor was to the effect that BMO would receive much less than its allowed claim in a chapter 7 liquidation, due to current poor market conditions and the superior lien of BB&T, as well as the saturation of the market that would occur if all Debtor's inventory were to be offered for sale at the same time.  In fact, Debtor's liquidation analysis indicates that if Debtor were liquidated, BMO would receive a total of only $1,711,663.  Debtor's Exhibit 9.  Under Debtor's Plan, BMO will receive $4.2 million.

When a representative for BMO was questioned about BMO's analysis of the liquidation value of its collateral and the amount he believed BMO would receive in a chapter 7 liquidation, he was unable to provide an answer and even indicated that BMO had not performed an independent liquidation analysis of Debtor.  BMO's representative simply stated that while he was unsure of how much BMO would receive in a liquidation, he believed BMO would receive more than under Debtor's Plan.  He could not provide any basis for this assertion.

The Court finds that under Debtor's Plan, BMO will receive at least the amount it would under chapter 7 liquidation. Mr. Chappell Jones' testimony regarding the current prices at which

Debtor's inventory could likely be sold indicated that a sale of Debtor's parts and equipment would produce proceeds of less than half of the products' book value. Mr. Jones' testimony further indicated that the current market for Debtor's products is poor, and as a result, Debtor's equipment and parts, if liquidated in the current market, would be sold for very low prices, if they could be sold quickly at all. With BB&T's first priority position with respect to Debtor's equipment, there would be little money left for BMO after BB&T's lien is paid. Debtor currently has few other valuable assets subject to BMO's lien. These facts lend to the conclusion that if Debtor were liquidated, BMO would receive little. The sale of Debtor's equipment over time, along with accompanying parts, support, and technical assistance sold to equipment purchasers, will result in a much better return to BMO. Under Debtor's Plan, BMO will receive the full amount of its claim, plus interest above its prime rate. For these reasons, the Court finds that Debtor's Plan does not violate section 1129(a)(7)(A).

### g. Feasibility

BMO's main objection to Debtor's Plan is based on feasibility. Section 1129(a)(11) sets forth the following requirement for confirmation of a chapter 11 plan: "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). Section 1129(a)(11) does not require that the debtor's plan is guaranteed to be successful, but must merely "present a workable scheme of organization and operation from which there may be a reasonable expectation of success." *In re Walker*, 165 B.R. 994, 1004 (E.D. Va. 1994) (quoting *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992)). *See also In re Smith*, 357 B.R. 60, 69 (Bankr. M.D.N.C. 2006) ("Success need not be guaranteed-the possibility that a plan may fail is not

fatal-but a plan must be supported by adequate evidence that some reasonable assurance of success exists.") (citing *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988); *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005)).  It is not enough for a debtor to exhibit "[s]incerity, honesty and willingness" or make "visionary promises" with respect to its plan.  *In re Walker,* 165 B.R. at 1004 (quoting *In re Hoffman*, 52 B.R. 212 (Bankr. D.N.D. 1985)).  "The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts."  *Id.* (quoting *In re Hoffman*, 52 B.R. 212 (Bankr. D.N.D. 1985)).  A court may consider several factors in assessing a plan's feasibility, including the reorganized debtor's capital structure, the debtor's projected earning power, the current state of the economy, the ability of management and the likelihood that the current management will continue to work for the reorganized debtors, and any other factors the court finds relevant to the success of the debtor's plan.  *In re Radco Props., Inc.*, 402 B.R. 666, 679 (Bankr. E.D.N.C. 2009) (quoting *In re Piece Goods Shops Co./Piece Goods Shops Corp.*, 188 B.R. 778, 798 (Bankr. M.D.N.C. 1995)).

At Debtor's confirmation hearing, both parties presented detailed evidence concerning Debtor's historical financial performance and Debtor's future financial projections.  Debtor's expert, Mr. Woodside, testified that he had examined Debtor's financial projections, which were prepared by Mr. Quirion.  Mr. Woodside stated that these projections, including the various scenarios created and the assumptions relied on in forming them, were reasonable.  These projections showed that Debtor would generate positive cash flow under all projected scenarios, including one scenario with sales as low as five GT-25s a year.  Mr. Woodside testified that in his opinion, Debtor would likely have positive cash flow over the course of the Plan.[4]  While

---

[4] Mr. Woodside's report projects that Debtor's ending cash flow will be as follows: $206,252 for 2011; $174,239 for 2012; $719, 653 for 2013; $1,397,596 for 2014; $1,678,046 for 2015; and $1,816,758 for 2016. Debtor's Exhibit 5.

Debtor's sales during the chapter 11 case have been even lower than the projections, there was credible evidence that Debtor has in the past and can in the future exceed these sales projections.

Mr. McAfee, BMO's expert, presented conflicting testimony.  Mr. McAfee testified that he analyzed Debtor's historical financial statements and Debtor's Plan to determine the financial condition of the company.  In his analysis, Mr. McAfee used Debtor's historical financial data to create over 60 different scenarios reflecting Debtor's possible future financial situation.  Mr. McAfee testified that in recent years, Debtor's performance had become less predictable and that Debtor's historical performance indicated it was very unlikely Debtor would be able to succeed in the future.  On cross-examination, however, Mr. McAfee expressed confusion as to exactly which Gyro-Trac entities' financial statements he used in his analysis, stating only that he used the statements supplied by Debtor.  As a result, the Court is unclear whether his analysis is based on Debtor's historical performance, another Gyro-Trac entity's historical performance, or some combination.  The Court notes, however, that the performance of Usitech, from which Debtor's manufacturing equipment was purchased, has not been considered.

In his testimony and his report, Mr. McAfee identified two main feasibility issues with Debtor's Plan.  The first is Debtor's projected gross margin.[5]  Mr. McAfee found that Debtor's projected gross margin of 38.2% is not feasible.  He based his conclusion in part on Debtor's historical figures, showing a median historical gross margin of 20.42% and a maximum gross margin of 24.01%, and in part on peer group[6] gross margins, which ranged anywhere from 22.4% to 31.4%.  Mr. McAfee's report states that these numbers indicate management is "overestimating [its] ability to control future expenses and achieve pricing power given the industry norms."  BMO Exhibit D, pg 15.  Debtor's projections do reflect income based on an

---

[5] Gross margin is calculated as (Sales-Cost of Goods Sold)/Sales.  BMO Exhibit D, Exhibit C, pg 4.
[6] "Peer group" refers to the financial performance by similarly situated companies in the same line of business as Debtor.

undiscounted retail sales price for all equipment, despite the fact that nearly all equipment sales during the course of Debtor's case have been at a discount.  However, as discussed below, many of the economic factors that led to sales at discounted prices have changed.

The second main feasibility issue Mr. McAfee identified was working capital.  In evaluating Debtor's working capital, Mr. McAfee looked at Debtor's historical data and peer groups' data to determine days for receivable collection, days for turnover of inventory, and days to pay accounts payable.[7]    Mr. McAfee used these numbers to determine Debtor's future working capital requirements.   Debtor's historical figures reflect median days receivable of 69.88, median days inventory of 176.67, and median days payable of 15.83, while Debtor's Plan projects days receivable of 9.39, days payable of 33.78, and no change in days inventory.  Peer group data showed median days receivable of 43.45, days inventory of 86.9, and days payable of 32.3.   The numbers projected in Debtor's Plan suggest that Adjusted Working Capital will decrease, causing an increase in Debtor's cash flow and less need for additional capital in the future.   BMO Exhibit D, pg 16.   However, Mr. McAfee asserts, based on the company's historical performance, that Debtor will likely need to obtain a substantial amount of additional capital in order to continue operating.  BMO Exhibit D, pg 16.

Using these results, Mr. McAfee concluded that in his opinion, the projections prepared by Mr. Quirion and the assumptions included in those projections were unrealistic. Despite this, Mr. McAfee did concede that if all of Debtor's assumptions are correct, Debtor's Plan would be successful.   In twelve of the scenarios created in Mr. McAfee's report, Debtor would have positive cash flow after the first year of the plan.  BMO Exhibit D, pg 17.   Mr. McAfee also

---

[7] These figures are calculated as follows:
1. Days receivable = (365/Revenue)/Accounts Receivable
2. Days inventory = (365/Cost of Goods Sold)/Inventory
3. Days Payable = (365/Cost of Goods Sold)/Accounts Payable

stated in his testimony at the confirmation hearing that given certain conditions and changes to Debtor's financial situation, it was possible for the reorganized debtor to be a viable company.

BMO pointed out during the confirmation hearing that Debtor has failed to meet the cash collateral projections it set forth in its budget filed with the Court on March 31, 2010. For example, Debtor's budget projected that Debtor would have $1,398,062.00 in cash at the end of the week of October 4. However, Debtor's cash collateral report for October 1, 2010 through October 6, 2010 shows that at the end of that period Debtor had only $194,137.05.

Debtor testified at the hearing that there are a number of reasons for its failure to meet its cash collateral projections. Debtor presented a significant amount of testimony indicating that customers were reluctant to purchase products from it while it was in bankruptcy. A representative of the Fletcher Group, a potential purchaser of up to 50 of Debtor's machines, indicated that the Fletcher Group wanted Debtor to emerge from bankruptcy before it purchased any of Debtor's products. Debtor testified that many customers had indicated an intention to purchase once Debtor's chapter 11 case was concluded.

Debtor also continues to have a build-up of inventory it is unable to sell, due to its bankruptcy, a current poor market for its machines, and the dealers who continue to compete with Debtor for sales of Gyro-Trac products. Debtor presented testimony that the dealers who have been selling its products have sold nearly all of the Gyro-Trac products in their possession; as a result, Debtor will no longer have this competition, and potential customers will no longer be able to purchase new Gyro-Trac products from other sources. Additionally, the historical financial information relied upon by Mr. McAfee is, at least in part, from a time when Debtor's business model was very different than the model proposed for the reorganized debtor. The historical data reflects performance during the time that Debtor was essentially a wholesaler of

its equipment, with sales made only by dealers. The data from earlier times, when Debtor sold its own equipment, is a positive indicator of success.

The Court finds that Debtor has submitted sufficient information to show that its Plan is feasible. Debtor presented a substantial amount of testimony indicating that its projections were reasonable, and even BMO's expert witness conceded that if certain assumptions are fulfilled, Debtor's Plan would work. While it is possible that Debtor's Plan will fail, the Code does not require a debtor to guarantee the success of its proposed plan; a debtor must merely show a reasonable probability of success. The Court finds that Debtor has done so here.

The Court recognizes the difficulty with predicting a debtor's probability of success, but notes that the use of historical financial data to predict a debtor's future success is problematic, especially in Debtor's case. Debtor's plan of reorganization proposes a significant change in Debtor's business model, including the addition of a manufacturing component, the streamlining of processes, the resumption of retail sales of equipment, and other reductions in cost; therefore, Debtor's past financial figures are unlikely to be an accurate predictor of the future. Additionally, Debtor is in the process of developing a new product, a baler, which once developed and put on the market will be an additional source of revenue for Debtor.

BMO argues that the purpose of chapter 11 is to reorganize, not to create a new business. To the extent BMO argues that chapter 11 does not allow a debtor to completely abandon its old business and embark on a new and entirely different business venture, the Court agrees. However, that is not what Debtor is attempting to do. Debtor is proposing to eliminate those aspects of its business model that were unsuccessful in order to restructure its processes into a new, streamlined, more successful business model. Finding that a debtor is not allowed to do this would eliminate much of the usefulness of chapter 11. Chapter 11 is meant to allow

struggling businesses to eliminate those aspects of the business that are failing; as a result, it does not require them to continue down the same path they previously had traveled unsuccessfully. Debtor's Plan does not violate the purpose or spirit of chapter 11; in fact, it does just the opposite. The Court finds that Debtor's Plan is feasible.

### h.  Cram Down under section 1129(b)

Section 1129(b)(1) states:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

Because BMO is impaired and has rejected Debtor's Plan, section 1129(b) is implicated. The Court must therefore determine that the plan does not discriminate unfairly and is fair and equitable in order to confirm the Plan over the objection of BMO.

The Court addressed the discrimination issue in connection with its good faith discussion earlier in this Order. The Court also addressed BMO's objections under section 1129(b)(2)(B) and (C). In order for treatment of a secured creditor to be deemed fair and equitable, one of the three criteria set forth in section 1129(b)(2)(A) must be satisfied. *In re Bannerman Holdings, LLC*, No. 10-01053-SWH, 2010 WL 4260003, at *2 (Bankr. E.D.N.C. Oct. 20, 2010). These criteria are:

> (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A).

Section 1129(b)(2)(A) has been satisfied. Debtor's Plan provides that BMO will retain its liens on Debtor's property in the full amount of its claim, satisfying section 1129(b)(2)(A)(i)(I). Additionally, over the life of the Plan, BMO will receive periodic payments to pay its claim in full. Therefore, section 1129(b)(2)(A)(i) is fully satisfied, and Debtor's treatment of BMO is fair and equitable. Debtor's Plan should be confirmed over BMO's objection.

### i. Confirmation of Debtor's Plan

For the reasons stated above, the Court finds that Debtor's Plan should be confirmed and BMO's objections overruled. Debtor's Plan satisfies all the requirements of section 1129. Debtor's Plan filed June 4, 2010, as modified September 30 and October 7 and subject to the provisions in the October 29, 2010 modification adding Class 13 in Article II and clarifying the Gyro-Trac entities' merger procedures in the first paragraph of Article II is confirmed. A separate order will be entered.

### II. Motions to Consolidate

Debtor filed its Motion to Consolidate on June 21, 2010. West Coast and GT Inc. filed their Motions on June 22, 2010. Debtor, West Coast, and GT Inc. request substantive consolidation of their chapter 11 cases because Debtor's Plan proposes to consolidate the Gyro-Trac entities into a single, reorganized company. Debtor claims that substantive consolidation is best for all

parties, including the creditors, because creditors dealt with the Gyro-Trac entities as a single economic unit and with one exception, all creditors are creditors of more than one of the entities. The Gyro-Trac entities frequently transferred and loaned money between themselves and therefore their assets and capital are intermingled. BMO responds that the Gyro-Trac entities are separate companies that maintained separate identities, with separate accounts and financial statements, and therefore no entanglement has occurred. BMO further argues that creditors such as it relied on the entities' separate identities, and that the debtor entities have failed to show how creditors could benefit from substantive consolidation.

The doctrine of substantive consolidation is based strictly on equity; as a result, courts have broad discretion in determining whether to substantively consolidate bankruptcy cases. 2 Collier on Bankruptcy ¶ 105.09[d][2] (16th ed. 2010). In analyzing a debtor's Motion to Consolidate, this Court has previously stated:

> Substantive consolidation is an action allowed by the broad equitable powers of 11 U.S.C. § 105. This Court has previously utilized the test adopted in the Second Circuit to determine whether to substantively consolidate a debtor's estate with a related entity. Under this test, substantive consolidation is appropriate when 1) creditors dealt with the entities as a single economic unit and did not rely on separate identities in extending credit or 2) when the affairs of the debtor are so entangled that consolidation will benefit all creditors. A cause of action for substantive consolidation may be dismissed from a complaint if there are insufficient allegations of entanglement or creditor reliance.

*In re Derivium Capital, LLC*, 380 B.R. 429, 441–42 (Bankr. D.S.C. 2006) (internal citations omitted). A request for substantive consolidation should not be granted as a matter of procedural convenience; because substantive consolidation can significantly affect a party's substantive rights, it should be used sparingly. *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988).

In the present case, the Court finds that the bankruptcy cases of Debtor, West Coast, and GT Inc. should be substantively consolidated. At least one of the two factors in the test set forth in *Derivium Capital* is met. While the loan issued by BMO was given to West Coast, BMO required personal guaranties of both Debtor and GT Inc. and obtained a lien on the assets of all the entities. Other creditors appear to have done the same. Additionally, Debtor, West Coast, and GT Inc. engaged in transfers of assets and capital and issued loans between the entities, causing the entities' affairs to be co-mingled. Many of the employees and principals working for the Gyro-Trac entities appear to hold or have previously held positions with more than one of the entities. Debtor's Plan proposes for Debtor, West Coast, and GT Inc. to merge with International to form one single entity; this process will likely be substantially frustrated without substantive consolidation. Additionally, the cost of three separate bankruptcy reorganizations would significantly hamper Debtor's chance for success. Creditors will not be harmed by substantive consolidation; in fact, creditors will likely benefit. Substantive consolidation will not affect distributions to creditors but will actually facilitate implementation of Debtor's Plan and will allow creditors to be paid more efficiently. Allowing consolidation will also eliminate substantial confusion for creditors in determining who to look to for distributions and will ensure that creditors are paid using the reorganized debtor's combined resources. Based on the above considerations, the Court finds that substantive consolidation is warranted in Debtor's case. Debtor, West Coast, and GT Inc.'s Motions to Consolidate are granted.

### III. Debtor's Continued Use of Cash Collateral

BMO filed a Motion to Prohibit Continued Use of Cash Collateral on October 11, 2010, arguing that the April 7, 2010 Order issued by this Court only allowed Debtor to continue using cash collateral pursuant to its proposed budget filed March 31, 2010 and ending the week of

October 4, 2010. BMO also submits that Debtor's previous budget was unrealistic, that it has not received the full amount of projected adequate protection payments, and that Debtor has fallen short of its cash balance projections. Debtor's use of cash collateral was authorized through December 1, 2010, pursuant to an Order entered by this Court on October 14, 2010. Debtor filed a Response and Motion to Extend the Court's Cash Collateral Order on November 22, 2010.

Section 363 governs the use of cash collateral. Section 363(b)(1) allows a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," and section 363(c)(1) provides that the debtor may only do so if "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." This Court previously authorized Debtor's use of cash collateral, subject to certain conditions, in its Orders issued April 7, 2010 and October 14, 2010. Debtor appears to have complied with those Orders and continues to file weekly cash collateral reports, the most recent being filed December 6, 2010. Debtor also filed an amended budget on December 1, 2010. Debtor's use of cash collateral going forward does not have to be considered by the Court; confirmation of Debtor's Plan renders BMO's Motion to Prohibit moot.

**IV. BMO's Motions for Relief from Stay**

Two Motions for Relief from Stay filed by BMO are presently before the Court. BMO filed a Motion with respect to West Coast on May 19, 2010 and a Motion with respect to Debtor on November 2, 2010. With respect to West Coast, BMO asserts that West Coast is not currently operating, is incapable of providing BMO with adequate protection, and is unable to successfully reorganize. With respect to Debtor, BMO asserts that it has no confidence in Debtor's management or Debtor's ability to reorganize and that it is not adequately protected because its

26

collateral is "eroding in value".  BMO therefore seeks relief from the automatic stay with respect

to both parties under section 362(d)(1) and 362(d)(2).  Because the Court has found the

bankruptcy cases of West Coast and Debtor should be substantively consolidated, it will address

the Motions together, referring only to Debtor.

> Section 362(d)(1) and (2) state:
>
> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if –
>
>> (A) the debtor does not have an equity in such property; and
>> (B) such property is not necessary to an effective reorganization.

Bankruptcy judges have broad discretion in determining what constitutes sufficient cause to

grant relief from stay under section 362(d)(1).  *In re Lee*, 428 B.R. 667, 669–70 (Bankr. D.S.C.

2009) (citing *In re Breibart*, No. 03-07440-W, slip op. at 2 (Bankr. D.S.C. Feb. 17, 2004)).

Because the Code does not provide any definition of what constitutes cause, the decision as to

whether to grant relief from stay is made on a case by case basis.  *In re Ramkaran*, 315 B.R. 361,

363 (D. Md. 2004) (citing *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992)).  In making his

decision, a bankruptcy judge should weigh the "potential prejudice to the bankruptcy debtor's

estate against the hardships that will be incurred by the person seeking relief from the automatic

stay if relief is denied."  *Ramkaran*, 315 B.R. at 364 (quoting *In re Robbins*, 964 F.2d 342, 345

(4th Cir. 1992)).

In the present case, the Court finds that cause does not exist for a granting of BMO's Motions for Relief from Stay. As previously explained, Debtor proposes to pay BMO's claim in full, and will pay BMO much more than BMO would receive in a liquidation. BMO has also been receiving periodic adequate protection payments from Debtor during the course of the bankruptcy case. If BMO is granted relief from stay, Debtor's ability to reorganize using the full extent of its resources would be substantially frustrated. Therefore, the Court finds that cause does not exist to grant BMO relief from the automatic stay under section 362(d)(1).

BMO is also not entitled to relief from the automatic stay under section 362(d)(2). It may be true that Debtor currently does not have equity in the property. However, for relief from stay to be warranted under section 362(d)(2), both requirements of the subsection must be met. As to the second requirement, that the property is necessary for an effective reorganization, the United States Supreme Court has held:

> What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means . . . there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'

*United Savs. Assocs. of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76 (1988) (emphasis original) (citations omitted).

This Court has confirmed Debtor's Plan. BMO's collateral is necessary to that reorganization. Debtor needs its current inventory, manufacturing equipment, license, and other assets in order to continue operating under its Plan; without these resources, Debtor would have nothing left but its real property, making reorganization impossible. As a result, the Court finds that BMO is not entitled to relief from stay under either section 362(d)(1) or 362(d)(2). BMO's Motions for Relief from Stay are denied.

## <u>CONCLUSION</u>

For the reasons stated in this Order, Debtor's Plan meets the confirmation requirements of section 1129 and is confirmed. Debtor, West Coast, and GT Inc.'s Motions to Consolidate are granted, and the entities' bankruptcy cases will be substantively consolidated. The issues involving Debtor's continued use of cash collateral are moot. BMO's Motions for Relief from Stay with respect to Debtor and West Coast are denied as moot.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**12/22/2010**



David R. Duncan
US Bankruptcy Judge
District of South Carolina

Entered: 12/22/2010